Chicago and North Western Railway Company, a Corporation, Plaintiff-Appellant, v. Toledo, Peoria & Western Railroad Company, a Corporation, J. Russell Coulter, et al., Defendants-Appellees, and Robert J. Strand and Local Lodge No. 926 of the Brotherhood of Locomotive Firemen and Enginemen, and John W. Towles and Local Lodge No. 1084 of the Brotherhood of Railroad Trainmen, Intervenors-Appellees.

Robert J. Strand and Local Lodge No. 926 of the Brotherhood of Locomotive Firemen and Enginemen and John W. Towles and Local Lodge No. 1084 of the Brotherhood of Railroad Trainmen, Counter-Claimants, v. Chicago and North Western Railway Company, a Corporation, and Toledo, Peoria & Western Railroad Company, a Corporation, Counter-Defendants.

Gen. No. 67–42.

Third District.

April 29, 1968.

Swain, Johnson & Gard, of Peoria, and Richard M. Freeman, Robert W. Russell, and James P. Daley, of Chicago, for appellant.

Heiss, Day & Bennett and C. D. Hawley, of Cleveland, Ohio, Louis F. Knoblock, Cassidy, Cassidy, Quinn & Lindholm, of Peoria, and Elson, Lassers & Wolff, of Chicago, for appellees.

SCHEINEMAN, J.

In the vicinity of Peoria, Illinois, the Chicago and North Western Railway and the Toledo, Peoria & Western Railroad have main line tracks which traverse upon or along a large area of land suitable for industrial use. Much of this space was owned by TP&W. The main lines are parallel for some distance and at Sommer are in close proximity. TP&W runs generally east and west from Indiana to Iowa while the North Western runs generally north and south.

There were a few industrial users in this area in 1956, which were served by one of these railroads upon side tracks or spurs. However, most of the acreage was vacant and producing no revenue or business for the owner.

At that time there was in Peoria a local railroad known as Peoria and Pekin Union (P&PU) which did switching to transfer freight cars from each of these main lines to the other. For this service a fee was charged but, besides the cost, there was the disadvantage that a substantial delay occurred in the delivery of cars to their ultimate destination.

The management of TP&W desired to improve these conditions. Mr. Coulter, its president, had a meeting with Mr. Fitzpatrick, president of C&NW and they looked over the situation.

Among Mr. Coulter's suggestions were these: At Sommer a crossover track and siding could be built at comparatively small cost thereby permitting direct transfer of cars between the two railroads. Also they could enter into a mutual trackage agreement whereby each could operate on the tracks of the other, including small portions of main line and the sidings or spurs of both companies, thereby avoiding the large expense of duplicate trackage.

It was known that shippers deemed it highly desirable to have two-line haul railroads serve their plants as this produced a number of advantages.

299

Mr. Fitzpatrick saw merit in the proposals. It was then agreed that negotiations should proceed to the end that a mutual trackage contract be prepared. There followed extensive negotiations including personal interviews, telephone conversations, and correspondence. Eventually a written contract was executed dated July 25, 1957, and introduced in evidence as Plaintiff's Exhibit 1 (PX1).

The contract with map attached specified 5.9 miles of C&NW main line (called North Western Segment) over which TP&W could operate, and 4 miles of TP&W main line (called Toledo Segment) plus the extension to Kingston Lake, on which C&NW could operate. Obligations of maintenance of side tracks and new construction were set forth, also liability for injuries or damages.

The two companies then filed a joint application to the Interstate Commerce Commission for approval of their proposal. The Commission heard evidence and entered an order which approved the joint trackage use and also abolished the switching contract of P&PU.

The contract and the Commission order contained authority for each railroad to operate over the other's specified tracks in either of two methods, i. e., "either directly with its own engines and crews or through an arrangement with the other party upon such terms and conditions as may be mutually agreed upon."

The industrial sites with double railroad service were nationally advertised and produced the desired result. New industries moved in and provided freight for the companies. One had already started to build a coal burning electric plant which would eventually require a very large annual tonnage. Later Archer-Daniels-Midland Co. (ADM) built its plant and required movement of a large number of freight cars. There were other plants that became established in the area. For the time being the railroads had an operating agreement, introduced in evidence as Defendant's Exhibit 1 (DX1).

During the period of negotiations officials of operating unions of TP&W became alarmed over the possibility that the North Western would operate on their lines with North Western engines and crews. Protests were made and they were going to resist the application to the Interstate Commerce Commission. Mr. Coulter assured them orally and by letter that the railroads were not going to operate on each other's tracks with their own engines and crews. With this understanding the unions then approved the application before the Commission and the Commission in its order found that the employees of the railroads were not adversely affected by the proposed plan.

The cooperation of the managements of the two railroads had resulted in profitable additions to the business of both. Then came a time in which cordial relations ceased and disputes arose. In March 1962 C&NW notified TP&W it was going to serve ADM with its own engines and crews, and cease turning their cars over to TP&W for switching. However, when it undertook to act, it was prevented by direct action of TP&W employees and officials. Thereafter it filed suit in Federal District Court asking for enforcement of its contractual rights. The suit was dismissed by the Circuit Court of Appeals for lack of jurisdiction, on the ground there was no Federal question involved. This present suit was then filed in the Circuit Court of Peoria County to obtain specific performance of the contract and to enjoin interference by the defendant. The Labor Unions were given leave to intervene and they filed a counterclaim asking for an injunction to restrain the plaintiff from operating its engines and crews on the TP&W tracks.

The cause was heard in Circuit Court and resulted in the decree for the defendant, dismissing plaintiff's complaint and also the counterclaim. This appeal was then perfected and the Unions filed a cross-complaint.

The plaintiff contends the decree is contrary to the law and the evidence, that the trial court ruled incorrectly on admissibility of evidence and that it improperly changed a complete contract that was not ambiguous.

The law relied upon is that when parties enter into a contract that is complete and unambiguous, oral agreements not incorporated therein are regarded as rejected and parole testimony is not admissible to show additional agreements. Robbs v. Illinois Rural Rehabilitation Corp., 313 Ill App 418, 40 NE2d 549; and others.

The defense relies upon certain exceptions to the rule, i. e., that previous and contemporary transactions and facts may be considered when there is ambiguity in the contract. Olson v. Rossetter, 399 Ill 232, 77 NE 2d 652.

"Whether the written contract was intended to be the complete and final agreement, must be determined from the language of the contract and the circumstances of the case. If it is silent in essential particulars, parole evidence is admissible to establish the missing parts." Stevens v. Fanning, 59 Ill App2d 285, 207 NE2d 136.

It was this principle which the chancellor invoked in the admission of evidence of prior negotiations both oral and written. We must examine the whole of the written agreement and observe whether any essential parts are omitted or left ambiguous.

For the most part, the contract indicates a complete and detailed agreement by both parties cooperating for their mutual advantage. Then we come to several paragraphs in which there occurs a repeated phrase as to alternative methods of serving industry presently or hereafter located within the joint industrial area: 1—directly with its own engines and crews, or 2—through an operating arrangement with the other party "as may be mutually agreed upon."

It is clear as to the second alternative, this contract contemplates a separate agreement not set forth in it,

and one upon which it assumes the parties will agree or have agreed.

The claim of plaintiff that its exhibit (PX1) is complete in itself runs afoul of its provisions referring specifically to a separate operating agreement. This is not the only difficulty. The alternative provision for direct service to industries by each company using its own engines and crews, fails to state that either party may put this into effect unilaterally without the consent of the other, and on the other hand, fails to state that this also is a matter for mutual agreement. Hence this contract cannot be regarded as complete and covering all matters to be agreed upon.

The plaintiff has assumed it had the unilateral right to put into effect a moving of its cars with its own engines and crews over defendant's tracks. There was in existence a separate operating agreement which provided for the second alternative method, especially providing that the defendant could serve the electric plant on the C&NW Segment. Defendant had also been serving the ADM plant from the time of its origin to the date of this contract.

The contract further provided that each party should retain any part of the tariff payable to it as a line-haul railroad and would pay the other party a flat fee of $5 per car for switching.

The evidence does not disclose that any difficulty arose, or that any complaint had been made. Yet in April 1962 plaintiff notified defendant it was going to furnish its own direct switching service to the ADM plant, using defendant's tracks.

We are unable to find any writing in PX1 which indicates the right to change the operation by unilateral action. Since everything else but the method of operation has been mutually agreed upon, it would seem reasonable that this would also be subject to mutual agreement. But, as noted, there is no wording to that effect. The contract is silent in this important particular.

Its importance is shown in the evidence. A number of experienced railroad men testified to the complex difficulties which would arise if both parties did switching at the same time and place. Injuries and damages could result. The switch crew of defendant serving ADM had worked an average of five hours a day, six days a week and sometimes as high as seven hours. The testimony of experienced railroad men was that for another switch crew to operate the same place, it would have to be at different times. And if plaintiff did switching after the defendant had finished for the day, cars already spotted as required by the shipper would have to be moved, thus interfering with the loading schedule of the shipper.

Mr. Coulter also testified that during negotiations, Mr. Fitzpatrick repeatedly expressed the opinion "it would be a poor operation and procedure to have both engines and crews in the same area at the same time and it would be an impossible situation." This testimony is uncontradicted. Mr. Fitzpatrick did not appear as a witness.

■ In view of this difficulty established by a preponderance of the evidence we must conclude PX1 is not a complete contract. Essential particulars are not included. In this situation it was proper to admit the evidence as to the prior negotiations. Meyer v. Sharp, 341 Ill App 431, 435, 94 NE2d 510; Fuchs & Lang Mfg. Co. v. R. J. Kittredge & Co., 242 Ill 88, 94, 89 NE 723; Stevens v. Fanning, 59 Ill App2d 285, 207 NE2d 136. The operating agreement and letters pertaining to the arrangement are all parts of the same transaction and must be construed together. 12 Am Jur, "Contracts," § 246.

The Interstate Commerce Commission order approving the contract adds nothing to it. Looking to the future, the parties considered it might be desirable sometime to change their operating methods. Naturally they asked for and obtained approval of both methods in this order, to avoid having to appear before the Commission again on the same subject.

The testimony and exhibits which the Court admitted over objection are too voluminous to be set forth in detail in this opinion. In summary, about the time the presidents of the two companies were agreeing that switching operations by both at the same time and place were not possible, they discussed an operating agreement orally, later referred to in correspondence, which covered the switching problem. Still later this was substantially included in the executed written contract referred to as DX1 dated April 10, 1959. This is nearly two years after the date of PX1 which is the principal subject of this suit, and the later contract must be regarded as implementing the provisions therein for an operating agreement "upon such terms and conditions as may be mutually agreed upon."

Thus the plaintiff is arguing that its exhibit PX1 is complete and cannot be interpreted with the aid of any other evidence whereas it shows on its face that it is not complete and does not cover essential particulars.

While some of the argument over this contract appears to concede that it applies to future extensions of sidings, there is one reference to a statement which appears both in PX1 and also in DX1. Reference is made to the statement: "Each party shall have the right to use any and all industry tracks existing on the date hereof . . ." This is said to preclude its application to ADM which did not exist at that time. However, we feel this language only made it clear that the rights given did apply to existing tracks, but not to the exclusion of extensions and future construction.

We here point to other writing in PX1 with emphasis added to call attention to the fact this does not exclude later construction. The same sentence above quoted as it appears in PX1 reads as follows: "Each party shall have the right to use any and all industry tracks existing on the date hereof for the purpose of serving industries now or *hereafter* located within the joint industrial area. . . ."

In the next paragraph appears this phrase: "Each party shall have the right to use any and all industry tracks *to be constructed and maintained* . . . . for the purpose of serving industries, docks or facilities presently *or hereafter* located within the joint industrial area . . ." In a later paragraph reference is again made to "industry tracks as may *hereafter be constructed* . . . ."

When the parties included in the operating agreement DX1 dated in 1959 similar wording referring to "industries presently located . . ." it must be presumed the words were intended to have the same meaning which the same parties agreed upon in the 1957 contract which still was in force and effect.

It follows, and this Court so holds, that the ADM facilities were not excluded from the industries included in the contract.

It appears, therefore, that the trial court ruled correctly and that the evidence justifies a decree in favor of the defendant dismissing plaintiff's complaint.

■ We regard the weight of the testimony as indicating that the parties recognized the use of their own engines and crews on the same sidings at the same time as the other was not practical and that the operating agreement came into existence for that reason. There are certain specific uses specified in DX1. There was in it also a provision for cancellation, which we regard as bearing out the intention that the operating agreement was subject to change or a new substitute upon agreement of the parties. The cancellation could be by either party alone. However, neither contract nor other evidence permits either party alone to cancel arrangements for switching operation and proceed to the use of its own engines and crews on the tracks of the other, without its consent.

The decree dismissing plaintiff's complaint thereby refuses any specific performance of the alleged contract and refuses to enjoin interference and leaves it to the parties

to carry out their agreement that one or the other method of handling the switching duties should be subject to mutual agreement.

The appellant contends that the president of TP&W was not authorized to negotiate with union representatives in behalf of North Western. Considered as a question of fact, the evidence is not sufficient to establish an agency of Mr. Coulter to represent C&NW. There may be other matters bearing on this subject as a matter of law. For example the intervenors cite a Federal case to the effect that an employer has a duty to bargain with a union prior to the transfer of work to another employer. United Industrial Workers v. Board of Trustees of the Galveston Wharves, 351 F2d 183, CA 5th (1965). However, the dismissal of the plaintiff's complaint had the practical effect of removing the reason for the cross-complaint. Therefore, it does not appear to be necessary that this decision make any ruling as to the status of the operating unions. We regard it as proper that the chancellor dismissed the countercomplaint under the circumstances.

The rulings of law in the Circuit Court were correct, and the resulting decree is within the scope of the evidence. Therefore the decree is affirmed.

Decree affirmed.

ALLOY, P. J. and STOUDER, J., concur.