## La Verna McGregor Meyer and Louis K. Meyer, Administrators of Estate of L. E. Meyer, Deceased, Appellants, v. Olen D. Sharp et al., Appellees.

### Term No. 50M7.

Heard in this court at the May term, 1950. Opinion filed September 20, 1950. Released for publication October 20, 1950.

COTTON & MASSEY, of Paris, for appellant; ROBERT F. COTTON and EARL R. ANDERSON, both of Paris, of counsel.

A. K. SWANN, of Evansville, and WALTER F. KOLB, of Mt. Carmel, for appellees.

MR. PRESIDING JUSTICE SCHEINEMAN delivered the opinion of the court.

In this suit, L. E. Meyer, the original plaintiff, charged that he and defendant, Olen D. Sharp, had entered into an oral partnership agreement in 1946, for the purpose of procuring blocks of oil leases, and the development of the projects, including drilling and other operations; that in January 1947, they prepared and signed a written agreement; that they had carried on the business ever since and acquired many oil leaseholds; that the defendant had secretly and clandestinely acquired interests in valuable oil leases by the use of the partnership good will and from the capital and income of the partnership, but had kept title thereof in his own name.

The complaint prayed that the court declare the defendant held such title in trust for the partnership, that the defendant be required to convey a one-half interest in all such leases to the plaintiff, and for an accounting and other appropriate relief.

Two corporations were made defendants for the purpose of tying up the income from producing properties, and they have no interest in this appeal, so that all references herein to the defendant apply only to Olen D. Sharp.

An answer was filed by said defendant, to which there was a reply. The issues of fact thereby raised, and argued on this appeal, resolve into the question whether either or both of the following two defenses are established: (1) That plaintiff had no interest in defendant's personal projects, because it was mutually agreed that no project should be undertaken unless both parties approved it, and none were undertaken for joint benefit except upon mutual consent;

(2) That in the latter part of 1947, it was mutually agreed to discontinue the mutual arrangement, and to undertake no new projects, but to complete those already begun, and no new projects were thereafter begun under the old agreement. There was also a counterclaim, asserting that Meyer owed defendant for some advancements made.

The cause was heard in chancery, and after several days of testimony, the chancellor found the issues for the defendant and dismissed the complaint, except as to a small sum found due on accounting, for which judgment was given plaintiff, and the counterclaim was dismissed *in toto*. The decree specifically found that the arrangement was terminated about October 1947, except as to incomplete deals, and that Meyer had no interest in new projects thereafter undertaken by the defendant.

After the final decree, the plaintiff died and his administrators were substituted in this appeal by leave of this court. References in this opinion to the plaintiff apply to L. E. Meyer, the deceased.

The two issues of fact above stated are highly controverted in the voluminous evidence, so that this opinion must be devoted almost entirely to an analysis of the testimony. There is practically no relevant problem of law involved, except the contention advanced by appellants that the written contract of the parties constituted a full and complete partnership agreement, so that parol evidence was inadmissible as to terms of their agreement. The written contract, alleged in the complaint and admitted by the answer was as follows, signed by the two parties:

"It is hereby understood and agreed by the undersigned that as of this date, January 1, 1947 (1-1-47) the Olin D. Sharp Co. is formed. This company is owned solely by Olin D. Sharp and L. E. Meyer. Each, Olin D. Sharp and L. E. Meyer, are to furnish one

half (½) of the money necessary for capital to operate this company. Each of the above named are to share equally in any profits or benefits derived from the operation of this company. The leases, interests and etc., are to be taken in the name of Olin D. Sharp. Olin D. Sharp in turn is to make an assignment to L. E. Meyer for a one-half (½) interest in each of the leases, interests, etc.''

In our opinion a mere reading of the foregoing makes it obvious that it is not, and does not purport to be, the complete agreement between the parties. It does not state what business they are entering, nor where, nor whether either or both is to devote full time and effort to the company business, nor whether services rendered the company are to be compensated, nor which shall have management authority, or whether both shall be equal therein, and contains no indication whether either or both parties are precluded from making individual investments for personal benefit in ''leases, interests, etc.'' or in anything else. In fact, the document is completely silent as to the duties and obligations of the parties, except that each shall contribute equally to the capital and share equally in profits and property acquired.

■■ Even if it be assumed that the document is sufficient to create a partnership, still it would be subject to the usual rule pertaining to contracts: If the agreement does not purport to be complete, and is silent in essential particulars, or is ambiguous, parol evidence is admissible to establish the missing parts, even though not admissible to contradict those unambiguous terms which are expressed in the document. *Fuchs & Lang Mfg. Co. v. R. J. Kittridge & Co.*, 242 Ill. 88; *Gault v. Hunt*, 183 Ill. App. 77. It was therefore proper to admit the testimony of the parties as to their conversations and dealings, in order to determine what they had agreed.

As a matter of fact, a great many additional terms of the agreement are alleged in the complaint as oral parts of the arrangement, and which it is assumed by appellants are in effect. Among others are these: that the business was for the purchase, exchange, assignment, sale and otherwise dealing in oil and gas leases, in and about Mt. Carmel, in Illinois and Indiana, for the assembling of leases in blocks of contiguous tracts; that it was to include all original processes and operations of promotion, also the engaging of drilling companies for test wells, including the first dealing of fractional interests, that there was to be a separate bank account for company funds, defendant was to be the manager, and that 25 leases previously acquired were part of the capital or business, as well as those later acquired.

Plaintiff's own testimony was to the effect that they had begun operations in 1946 under an oral agreement, which included an understanding that plaintiff was to advance all necessary capital, and defendant was to make up his share later as he was able, and that the purpose of the written agreement was to change this provision and make their obligations equal in the furnishing of capital, and that it was not intended to change their arrangement in any other way.

Referring now to the evidence, we find the following few items appear to be undisputed facts: The parties started their business dealings under an oral agreement early in 1946, and during that year acquired about 25 leases. About twice that number were acquired in 1947 after the date of the written contract. In October of 1947, plaintiff employed an accountant to prepare a statement of their financial dealings, which was done and showed a balance of a few hundred dollars to the credit of plaintiff. In December, plaintiff went to Florida, and was gone for three months, during which he did not communicate with defendant in any way. In 1948, there were only eight

436

new leases acquired, and most of these appear from their descriptions, to be parts of contiguous blocks, the acquisition of which was begun in 1947. Practically all of these ventures resulted in nothing but dry holes. Early in 1948, while plaintiff was still in Florida, defendant entered upon some new ventures in Indiana (which he claims were for his own benefit only) and these, known as the Berry and the Coffee-Island, turned out to be immensely valuable. Almost everything else is disputed.

Defendant testified that, after the accounting in October 1947, the plaintiff stated that he had lost eight or ten thousand dollars, and wished to discontinue their arrangement, as he did not care to risk any more, that his family was complaining, that he proposed to take a vacation in Florida, and did not wish to be concerned by further deals. That, after further conversations, plaintiff stated that defendant might go on and complete for their mutual interests, the projects already begun, but plaintiff declined to be included in any new ones. All of this is denied by the testimony of plaintiff, except he admits his family "fussed" at him about his losses.

Defendant also testified, on the other issue of fact, that they had a definite understanding no project should be undertaken for them both unless both agreed to it, and that this was their uniform practice in fact. This last is important, because courts often look to the conduct of the parties, with reference to their contract, as an indication of their own interpretation thereof, and thus tending to support the testimony of one or the other as to its true meaning and intent. *Nelson v. John B. Colegrove & Co. State Bank,* 354 Ill. 408; *Northern Illinois Coal Corp. v. Cryder,* 361 Ill. 274.

As to whether this was their custom and uniform practice, the testimony of the plaintiff is somewhat evasive. He was asked on cross-examination if it was

437

mutually agreed that their business deals should relate only to deals which both had approved in advance.

Answer: "You mean to say it wasn't?"

A similar question was then repeated, to which he answered:

"Well, I wouldn't be too specific about that. I don't believe I could answer that. Maybe you had better ask the question again."

The examiner then changed his question to the converse, and asked whether defendant "could go make any kind of an oil deal he wanted to, and bind both of you, without your approval?"

At this point, plaintiff's attorney interrupted and prevented any direct answer by making this statement: "That is the plaintiff's written agreement." As previously noted, the said agreement is completely silent on the subject. However, the witness did make this comment: "We talked it over that we would take up leases in certain areas."

Question: "Didn't you have an agreement to the effect that you would talk over any deal before the partnership?"

Answer: "There wasn't anything said just exactly that way."

After some further evasions, the witness finally asserted that there was no such custom.

The plaintiff did, however, make some admissions pertinent to the subject. He was asked whether, during the arrangement in question, he had made any private deals for his own use, whereby he acquired interests in oil leases in the vicinity, which were not a part of the deals with defendant. At first, he said there were three or four. Pressed to name them, he identified the Kenipp, the Hayes, and the Groff leases, also an overriding royalty and a working interest in the Schulz lease. On further cross-examination he admitted acquiring interests in the Fearheily In-

dividual, the Fearheily Community, the McGregor lease, and the Utendahl.

Apparently the plaintiff considered it perfectly legitimate to carry on private oil deals of his own. This lends color to defendant's claim that each was free to operate independently, and only those items specifically agreed upon were to be joint. Furthermore, plaintiff asserted in only one instance, the Utendahl, that he had invited defendant to participate in these private deals in oil leases. Appellants have suggested no reason why plaintiff should openly admit a series of private dealings, while claiming that similar deals by defendant were "secret and clandestine" and should be impressed with a trust.

■■ The plaintiff testified to certain financial dealings of the defendant with partnership funds, on prior occasions, which plaintiff considered improper. These claims were controverted by defendant, except that he admitted making a mistake in the 1947 accounting, which would have enlarged plaintiff's balance by $400. There is no evidence whatever to support plaintiff's allegation that defendant used partnership funds in procuring the Indiana leases. So far as the use of company funds is concerned, there is clearly no basis to claim a trust in the property now in defendant's name.

Appellants admit the total absence of any evidence to show use of partnership funds in Indiana, but contend this is immaterial, on the ground that defendant did not use any of his own funds either, that the deal was promoted without capital. Defendant denies this, and testified to the source of the funds he used. Whether the transaction was accomplished with, or without funds, the fact remains that the alleged basis to claim a constructive trust, failed to be proved.

It should be apparent from the foregoing that there was some reasonable basis upon which to find that the parties had agreed to limit their joint undertakings

to those mutually approved, leaving each free to undertake others privately, and that defendant's Indiana deals were private. However, it appears that the chancellor based the decree more upon the defendant's claim of dissolution of the company arrangement, which we now consider.

██ Whether the arrangement be called a joint venture or a partnership is immaterial in this respect. A partnership may be terminated by mutual consent at any time. 40 Am. Jur. Partnership, sec. 235. The fact that it is continued thereafter for purposes of winding up unfinished business, does not nullify the dissolution, and either party is free to enter upon projects on his own initiative and with his own funds, without subjecting them to any claim for accounting by the other. *Pierce v. McClellan,* 93 Ill. 245; 47 C. J., Partnership, sec. 795 (b).

Upon this question of dissolution, there are several circumstances in evidence which strongly tend to corroborate the defendant. Where the two parties so completely disagree, the court must look at their respective stories from the standpoint of which appears to be the more logical and reasonable under the facts. The plaintiff went to Florida on a vacation, and was gone approximately three months. During his absence, we perceive only three possibilities for defendant: (1) He could take a vacation for a like period. (2) He could continue working for the partnership. (3) He could work for himself.

As to the first possibility, the evidence shows defendant had devoted himself to promotions for about ten years, on very limited capital. Plaintiff took pains to prove that defendant overdrew his bank account on several occasions. It does not appear that he had any source of income other than his personal efforts, which had been practically fruitless for more than a year. We must reject the first alternative as being

highly improbable as well as unsupported by any evidence.

As to the second possibility, why should he work for the partnership and with what? By the statement of account, plaintiff had a credit balance with defendant of less than $400, which would not go far, even in completing blocks already begun. It does not appear reasonable that plaintiff should expect defendant to go on working for three months in plaintiff's behalf, when plaintiff contributed nothing, either in effort or in capital. It seems to us that plaintiff's discontinuance of his own participation in promotions for this long period, furnishing nothing whatever, indicates that he had decided to quit, just as the defendant alleges. This leaves only the third alternative, that defendant was expected to go on for his own account without plaintiff, except in deals begun and not completed. The following are other circumstances in evidence:

(1) Defendant wrote to plaintiff once during the latter's vacation, asking him to participate in something. The plaintiff admits that he did not even reply, and that he did not once communicate with defendant during the entire period.

(2) Although the parties had about 25 deals in 1946 and nearly twice that many in 1947, there were a total of only eight leases listed in 1948, and of these, some had a connection of some kind with the Ceney project, begun in October 1947. This sharp drop in activity tends to indicate that something had taken place to alter their mode of conduct. The reasonable explanation appearing in this case, is that plaintiff had decided to quit.

(3) The evidence discloses that there was no reason whatever for the defendant to suppose that he had something especially good in the Berry project, which might induce him to freeze out his partner. A

Mr. Appleby had accumulated the leases on this tract, but he had only 90 days to drill, and his arrangements had fallen through. A professional geologist had given an adverse opinion on the prospects. In spite of these obstacles, defendant undertook to promote the project.

(4) It is apparent that defendant had some difficulty in financing. The drilling cost from $10,000 to $12,000 and he tried to sell part of his interest to several people for a proportion of this cost. To some he offered a quarter of his interest for $3,000 or $3,500, to others he offered an eighth for $2,500 or $2,000, even as low as $1,500. The people with whom he dickered testified in the case. Since it is obvious he was trying to sell an interest to raise funds, there is no reason apparent why he should exclude the plaintiff, if the latter was really willing to participate.

The foregoing pertains to the testimony of the princiles in this litigation. Besides this, the defendant produced about eighteen witnesses who testified to various conversations in which the plaintiff made admissions against interest. All were denied or purport to be explained away by the plaintiff. Of these eighteen, two testified to conversations with plaintiff before he went to Florida in the winter of 1947-1948. They assert they heard him say that we was quitting the oil promotion business, he had lost enough, and was not going into any new deals. One of these witnesses was Mr. Appleby, who asserts that the Berry project was mentioned at that time, and plaintiff said he was not going into it, he had spent all he was going to, and was done.

The other witnesses, plus Mr. Appleby, who also had a later conversation with the plaintiff, testified to conversations with plaintiff, extending over a period from a few days after his return from Florida in March, to several months later. Without attempting

to detail all of these conversations, it appears in substance that the production of oil on the Berry property was a source of some excitement and interest in the small community in which these parties lived. The general tenor of remarks attributed to plaintiff were that: he had no interest in the Berry lease, that he had got out too soon, that Olen (defendant) had been lucky, while he (plaintiff) had gone in the wrong things and stayed out of the good ones, that he had invested all he had planned with no results and had quit just too soon, that it would have been better if he had stayed in, but he had decided to take out, etc.

■ It is our conclusion upon the factual issues that, in spite of the almost complete contradictions in the testimony of the two principals, the story of the defendant is the more logical and reasonable. It is also supported by admitted circumstances, and corroborated by the other witnesses. Therefore, the findings and conclusions of the chancellor are in accordance with the manifest weight of the evidence.

■ A few other points were made. The lengthy pleadings and some of the arguments on this appeal were devoted to the question whether the arrangement between these parties constituted a series of joint ventures, or a partnership. This is indicative of a common philosophy, that if only a legal name can be tacked to a given situation, all problems are magically solved. As a matter of fact, where the rights of third parties are not involved, and the only question is what were the terms of the agreement, the christening of the relationship with some legal term solves nothing. "A joint venture, as well as a partnership, is controlled by the terms of the agreement under which it is formed or created." *Harmon v. Martin,* 395 Ill. 595. It is wholly immaterial whether it be called a joint venture, or a partnership, or even a "company," as the parties chose to call it; the rights and obligations of

443

the parties still depended upon their own precise agreement in all particulars, including dissolution, or termination.

 Appellants also assigned as error the refusal of the court to sever the issues made by the counterclaim, which, it is claimed, were only cognizable at law and not in chancery. The counterclaim was dismissed without cross appeal, leaving nothing for appellants to attack. It appeared during the testimony that there was a small balance due plaintiff, and the court gave plaintiff judgment for $564.63 although denying all other relief. The amount thereof is not assigned as error, nor discussed in the briefs. Since this was only doing complete equity, appellants are in no position to complain.

The decree of the circuit court was correct in all respects, and it is affirmed.

*Decree affirmed.*

CULBERTSON and BARDENS, JJ., concur.