Oscar I. DODEK, Mildred S. Dodek
and Samuel M. Dodek II,
Appellants,

v.

CF 16 CORPORATION, John J. Mason,
Stuart A. Bernstein, Richard S. Cohen,
MBC Associates and 1001 Pennsylvania
Avenue Associates, Appellees.

No. 86–1060.

District of Columbia Court of Appeals.

Argued Sept. 17, 1987.
Decided Feb. 11, 1988.

Glenn M. Cooper, with whom Ronald A. Dweck and Keith A. Minoff, Bethesda, Md., were on the brief, for appellants.

Rodney F. Page, with whom James W. Gladstone, Washington, D.C., was on the brief, for appellees CF 16 Corp., MBC Associates, and 1001 Pennsylvania Avenue Associates.

Burton A. Schwalb, with whom Amy G. Rudnick, Washington, D.C., was on the brief, for appellees Mason, Bernstein, and Cohen.

Before FERREN, BELSON, and TERRY, Associate Judges.

FERREN, Associate Judge:

In October 1983, appellants Oscar I. Dodek, Mildred S. Dodek, and Samuel M. Dodek II (the "Dodeks") sued appellees John J. Mason, Stuart A. Bernstein, Richard S. Cohen, MBC Associates, 1001 Pennsylvania Associates, and CF 16 Corporation claiming damages based upon alleged breach of contract, fraud, and breach of fiduciary duty. These claims related to three contracts pursuant to which the Dodeks sold commercial real estate in the District of Columbia. After some discovery, the Dodeks moved for partial summary judgment on the issue of liability. All the defendant-appellees filed cross-motions for summary judgment. The Dodeks then moved to amend their complaint. On June 10, 1986, after oral argument on the summary judgment motions, the trial court denied the Dodeks' motions and granted defendant-appellees' cross-motions. The Dodeks have appealed. Because we agree with the trial court's rulings with one exception, we affirm the judgments as to appellees MBC Associates, 1001 Pennsylvania Avenue Associates, and CF 16 Corporation. As to appellees Mason, Bernstein, and Cohen, we affirm in part and reverse in part.

I.

On October 25, 1979, Oscar Dodek executed two contracts, and Oscar, Mildred, and Samuel Dodek executed another contract, for the sale of three commercial lots to appellees Mason, Bernstein, and Cohen (the "Dodek contracts"). These lots, then numbered 2, 819 and 20, respectively, were in Square 348, the city block bounded by 10th, 11th, D, and E Streets, Northwest.[1] Lots 819 and 20 fronted on 10th Street and sold for $155 per square foot; Lot 2 fronted on D Street and sold for $200 per square foot. Lots in Square 348 were at that time being assembled for redevelopment under the supervision of the Pennsylvania Avenue Development Corporation (PADC) as part of a comprehensive redevelopment of the Pennsylvania Avenue corridor.

Mason, Bernstein, and Cohen purchased the Dodek lots on behalf of their limited partnership, MBC Associates, which had been formed for the purpose of purchasing and developing real estate in the District of Columbia.[2] Specifically, MBC was engaged in assembling lots in the eastern, 10th Street half of Square 348 for the eventual development of an office complex, contingent on PADC approval.[3] In October 1980, Mason, Bernstein, and Cohen formally assigned the Dodek contracts to MBC.

---

1. D Street has since been closed, and the block is now bounded on that side by Pennsylvania Avenue.

2. The Dodek contracts show Mason, Bernstein, and Cohen individually as purchasers, apparently because the Dodeks preferred to deal with the individuals rather than with their partnership. It is undisputed, however, that Mason, Bernstein, and Cohen were acting for MBC when they purchased the Dodek lots.

3. In March 1980, PADC issued criteria requiring development of Square 348 as a single property. To that end, MBC joined with 1055 Pennsylvania Avenue Associates and 425 11th Street Associates, the two partnerships that were assembling property in the western half of the Square, to form a joint venture called 1001 Associates. (1001 Associates should not be confused with 1001 Pennsylvania Avenue Associates, a partnership formed later by CF 16 Corporation.) The three partners in the new joint venture controlled, or would eventually control, all of Square 348. 1001 Associates submitted a proposal to PADC for a single development incorporating the entire Square.

On October 15, 1980, the Dodeks and Mason, Bernstein, and Cohen went to settlement on the Dodek lots. The deeds executed at settlement conveyed fee simple ownership of the Dodek lots to MBC.

In addition to MBC's purchase of the Dodek lots, certain of MBC's other land acquisitions in Square 348 are of particular importance to this case. Lot 820 and Lot 16 (the "Morrissette lot"), both fronting on 10th Street, are significant because MBC's acquisition of those lots allegedly triggered the price escalation clause in the Dodek contracts under which the Dodeks now seek to recover. MBC went to settlement on Lot 820 on June 23, 1980, pursuant to a contract dated and executed on May 10, 1979. The partnership gained control of the Morrissette lot by virtue of a 99–year ground lease executed in 1982, after MBC had been purchased by the CF 16 Corporation. Also of significance to this case is Lot 800, which MBC acquired in July 1980, when the owners of the lot sold it to MBC in exchange for an interest in the partnership. The Lot 800 transaction is important not for the lot itself, but because the transaction is indicative of one of the various ways in which individual lot owners, like the Dodeks, participated in the development of Square 348.

The sale of MBC to CF 16 figures prominently in this case. Mason, Bernstein, and Cohen had contracted to sell their partnership interests in MBC to CF 16, a subsidiary of the Canadian conglomerate Cadillac–Fairview, on October 16, 1980, one day after settlement on the Dodek contracts. Settlement on the contract with CF 16 took place on April 9, 1981. The transfer of MBC's partnership assets to CF 16 was effectuated by having CF 16 join MBC as a partner and, then, by having the other MBC partners withdraw. MBC fulfilled its original mission when, under the ownership of CF 16, MBC executed the lease on the Morrissette lot, finally completing the assembly of the eastern half of Square 348. Thereafter, MBC continued to hold title to certain properties in Square 348 as a Cadillac–Fairview subsidiary.

CF 16 subsequently acquired the assets of 425 11th Street Associates (the "Clark" partnership) and 1055 Pennsylvania Avenue Associates (the "Evans" partnership), the two partnerships that were assembling lots in the western, 11th Street half of Square 348. The acquisition of these additional partnerships gave CF 16 control of all of Square 348, permitting CF 16 to develop the entire block as a single property, as PADC required. *See supra* note 3. CF 16 carried out its successful development of Square 348 through a limited partnership it formed for that purpose called 1001 Pennsylvania Avenue Associates.

**II.**

Each of the Dodek contracts contains what the Dodeks have characterized as a "most favored nation" clause. This clause entitles the Dodeks to an increased purchase price equal to the highest per-square-foot price subsequently paid by the purchasers of the Dodek lots—Mason, Bernstein, and Cohen—for any other lot in Square 348 that has the same frontage as one of the Dodek lots. This clause as it appears in the Lot 2 contract provides:

> 3. *Purchase Price....* The Purchasers agree that in the event the cost to them of acquiring ownership, either by purchase or through condemnation by Pennsylvania Avenue Development Authority for them, of any other property in Square 348 fronting on D Street, N.W., [is] for a price in excess of $200 per square foot, the purchase price hereunder shall be increased to equal the highest cost to them per square foot for any other property in Square 348 fronting on D Street. This provision shall survive the settlement of this contract of sale.

This clause is identical to the one in the other two contracts, except that 10th Street appears in place of D Street, and the triggering price is $155 per square foot instead of $200, reflecting the different frontage and lower selling price of Lots 819 and 20.

The Dodeks have never received an amount above the original purchase price of each of their lots. On appeal, they describe three separate "triggering events"

which, they contend, should have caused an increase in the purchase prices pursuant to the "most favored nation" clauses and which, therefore, entitle them to recover various sums from appellees.[4]

#### A.

The first alleged triggering event was MBC's settlement of a previously executed contract for the purchase of Lot 820 fronting on 10th Street.[5] The contract for Lot 820 had been executed in May 1979, five months before the Dodek contracts, but the settlement on Lot 820 took place in June 1980, eight months after the Dodek contracts. The Dodeks contend that the Lot 820 contract was merely an "option" contract entitling appellees to purchase the land at a specified price should they choose to go to settlement at a later date, and thus that the "purchase" of Lot 820 did not occur until well after the Dodeks' "most favored nation" clause had become effective.

More specifically, the Dodeks direct our attention to clause 11 of the Lot 820 contract, which provides in relevant part:

11. *Sellers' Remedy on Default.* In the event of the failure by Purchasers to perform [their] obligations hereunder,

even though all conditions precedent as herein specified are satisfied, then the Sellers' sole remedy shall be to forfeit the Purchasers' deposit made hereunder, and this Agreement will be deemed null and void and the Purchasers and Sellers shall have no further liabilities to each other.

The purchasers' deposit, set forth in clause 2 of the contract, was $50,000. The Dodeks argue that because the purchasers' sole liability, before settlement, was forfeiture of their deposit, a "purchase" did not occur until the settlement date, when, for the first time, the purchasers actually incurred an obligation to pay the full $548,-000 purchase price. Settlement on Lot 820, at a purchase price of $45 per-square-foot higher than that paid for the Dodek lots 819 and 20 fronting on 10th Street, did not take place until after execution of the Dodek contracts. Therefore, the Dodeks argue, the "most favored nation" clause entitled them to a $45 per-square-foot price increase for both lots.

#### B.

The second event allegedly triggering a price escalation under the "most favored nation" clause was MBC's acquisition, in

---

**4.** We understand the Dodeks' three claims to be offered in the alternative. Although they seek to recover for each of the three alleged "triggering events," it appears clear that recovery under one claim negates any other claim of lower dollar value. The "most favored nation" clause entitles the Dodeks to the difference between the price the purchasers paid to them originally and the single highest price the purchasers subsequently paid to someone else. It does not entitle the Dodeks to collect the *sum* of the differences between their price and *every* subsequent higher purchase price. Because, however, we conclude that the Dodeks are entitled to recover only on the smallest of their three claims, the question whether the claims are cumulative or alternative is not one we are required to decide.

**5.** Lot 820, fronting on 10th Street, and Lot 801, fronting on D Street, were sold together pursuant to a single contract. Appellees argue that the resulting L-shaped parcel should be treated as fronting on D Street only. Because the per-square-foot price paid for the combined parcel equals the per-square-foot price paid for the Dodek lot fronting on D Street, treating Lots 801

and 820 in this fashion would mean that no price increase under the Dodek contracts' "most favored nation" clause could be triggered. Even accepting appellees' argument that the combined lots should be treated as a single parcel, however, we find no merit in that contention. The L-shaped parcel opens onto both D and 10th Streets, and we see no reason why we should deem the parcel to front on one street rather than on the other. Accordingly, we address each lot separately and conclude, as do the Dodeks, that only the discrepancy between the price paid for Lot 820 and that paid for the Dodek lots on 10th Street is of relevance here. Furthermore, we treat Lot 820 as having sold at a price of $200 per square foot notwithstanding that this price assumes a blanket valuation for the entire parcel. It is, of course, conceivable that the parties arrived at the contract price for the parcel by calculating a higher value for Lot 801 and a somewhat lower value for Lot 820, and then averaging the two. None of the parties, however, has argued that the two lots should be valued differently, and, in the absence of any evidence to that effect in the record, we treat the two lots as having sold for a single per-square-foot price: $200.

1982, of a 99–year ground lease on Lot 16, the Morrissette lot. The Dodeks do not allege that MBC's lease with the Morrissettes was a sham, or that it was in fact a purchase contract disguised as a lease. Rather, they suggest that the "most favored nation" clause should be interpreted to cover a lease of this kind. The Dodeks argue that the parties to the Dodek contracts meant by the critical language—"acquiring ownership, either by purchase or through condemnation"—any transaction that gave MBC the incidents of ownership, even if MBC did not acquire fee simple ownership itself. The Dodeks also contend that, although Mason, Bernstein, and Cohen—the "Purchasers" referred to in the Dodek contracts' "most favored nation" clause—no longer owned any part of MBC when the Morrissette lot was leased, MBC (and thus its new owner, CF 16 Corporation) continued to be liable to appellants as a "successor and assign" under the Dodek contracts.

### C.

Finally, the Dodeks argue that the "most favored nation" clause was triggered when CF 16 Corporation acquired the partnership assets of the other two partnerships that were engaged in assembling land in Square 348. Although this portion of the Dodeks' argument is difficult to follow, it consists analytically of two distinct parts. The Do-

6. The Dodeks' arguments here and in the preceding paragraph are based upon logically inconsistent assumptions. The previous argument assumes that MBC, although under the ownership of CF 16, is the "successor and assign" of Mason, Bernstein, and Cohen for purposes of the Dodek contracts. The Dodeks contend in the present argument that CF 16 itself, when it purchased MBC, became the "successor and assign." Clearly, MBC and CF 16 could not simultaneously have been the "successor and assign" of the Dodek contracts. Because, however, after considering the merits, we find neither of appellants' arguments persuasive, we are not required to resolve this conflict.

7. In the trial court and again in their brief on appeal, the Dodeks appeared to argue that CF 16's purchase of MBC's assets was also a triggering event. They argued that when CF 16 contracted to buy MBC, it became a "successor and assign" of Mason, Bernstein, and Cohen for purposes of the Dodek contracts, and also became a "purchaser" of higher priced lots (on 10th and D

deks contend, in the first step of their argument, that when CF 16 purchased the assets of MBC, CF 16 became a "successor and assign" of Mason, Bernstein, and Cohen for purposes of the Dodek contracts' "most favored nation" clause.[6] Thus, CF 16 replaced Mason, Bernstein, and Cohen as the "Purchasers" to which the "most favored nation" clause refers. In the second step of their argument, the Dodeks contend that CF 16 triggered the "most favored nation" clause again when it acquired the assets of the Clark and Evans partnerships. The Dodeks argue that because CF 16 purchased the partnership assets—consisting of property in Square 348, including lots fronting on D Street—at an average per-square-foot price higher than the original purchase price paid for the Dodek lots, the clause was invoked and the Dodeks became entitled to an increased purchase price equal to the price paid to Evans and Clark.[7]

### III.

The Dodeks contend the trial court erred in granting summary judgment to appellees as a matter of law, because the plain language of the Dodek contracts requires resolution of the issues in their favor. Alternatively, the Dodeks argue that the trial court erred in finding no genuine issue of material fact in dispute. If the court was unwilling to accept their interpretation of

Streets, owned by MBC) for purposes of the "most favored nation" clause. Accordingly, the Dodeks contended, CF 16 triggered a price increase under the "most favored nation" clause by paying MBC more for its lots on 10th and D Streets than Mason, Bernstein, and Cohen had paid to the Dodeks for theirs. Therefore, they argued, they became entitled to the difference between the price at which Mason, Bernstein, and Cohen bought from the Dodeks, and the price at which Mason, Bernstein, and Cohen sold to CF 16. Accepting this argument, however, would lead to the absurd result that Mason, Bernstein, and Cohen could not reap any profit from the resale of land they had purchased, assembled, and prepared for development. The Dodeks apparently abandoned this untenable argument in their reply brief. They did not attempt to resurrect it in oral argument. Therefore, we do not further address the issue here.

the contracts, they argue, the court should have found that the contracts are ambiguous and that their interpretation is an issue of fact which can only be resolved at trial.

### A.

■ In reviewing the trial court's grant of summary judgment, we must consider the evidence in the light most favorable to the non-moving party (here, the Dodeks) and determine, as the trial court was required to do, (1) whether any genuine issue of material fact exists and (2) whether appellees are entitled to judgment as a matter of law. *Taylor v. Eureka Investment Corp.*, 482 A.2d 354, 357 (D.C. 1984); *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983); *see* Super.Ct.Civ.R. 56(c) (1987). We first address the question whether there is a genuine issue of material fact. In so doing, we must conduct an independent review of the record. *Scrimgeour v. Magazine*, 429 A.2d 187, 188 (D.C.1981). This court is not bound by the rulings of the trial court. *Franklin Investment Co., Inc. v. Huffman*, 393 A.2d 119 (D.C.1978). Furthermore, it is not this court's function, in reviewing a grant of summary judgment, to resolve factual issues; rather, we are only to determine whether there are any relevant factual issues. *McCoy v. Quadrangle Development Corp.*, 470 A.2d 1256, 1259 (D.C.1983). If there is doubt as to whether a genuine issue of fact has been raised, summary judgment is precluded. *International Underwriters, Inc. v. Boyle*, 365 A.2d 779, 782–83 (D.C.1976). Mere demonstration of disputed factual issues, however, without more, is insufficient to overcome summary judgment. *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). The party opposing summary judgment must show that the fact is material and " 'that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties'

differing versions of the truth at trial.' " *Id.* (quoting *International Underwriters*, 365 A.2d at 782).[8]

### B.

■ The Dodeks have described three transactions which allegedly triggered the "most favored nation" clause. Thus, as a preliminary matter, we must consider whether there is a material factual dispute as to the substance of any of the alleged triggering events. We perceive no evidence in the record that suggests the three so-called triggering events occurred other than as the Dodeks have stated. To the contrary, the record amply documents the events they cite. Appellees, moreover, do not dispute that the events took place; rather, they argue that those transactions, as a matter of law, did not trigger a price increase under the Dodek contracts. Accordingly, we conclude that no genuine issue of material fact exists with respect to the alleged triggering events.

■ We next consider whether there is a material factual dispute as to the meaning of the Dodek contracts themselves. The meaning of an integrated contract is an issue for the finder of fact only if the contractual language is ambiguous, *Holland*, 456 A.2d at 815, *i.e.*, where its interpretation depends upon the credibility of extrinsic evidence or upon a choice of reasonable inferences from such evidence. *International Brotherhood of Painters and Allied Trades v. Hartford Accident and Indemnity Co.*, 388 A.2d 36, 43 (D.C.1978). Where a contract is unambiguous, however, "summary judgment is appropriate ... since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Holland*, 456 A.2d at 815.

■ Whether a contract is ambiguous is a question of law for the court to determine. *Id.* Furthermore, in determining

---

8. Although both the Dodeks and appellees moved for summary judgment, we must still inquire whether a material factual dispute exists. Cross-motions for summary judgment do not, in themselves, establish that there is no genuine issue of material fact, except in narrow circumstances, not presented here, where the motions are based on the same material facts and address the same legal issues. *Holland v. Hannan*, 456 A.2d 807, 814 n. 9 (D.C.1983).

whether a contract is ambiguous, the court must consider that "[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Id.* (citation omitted). Ambiguity exists only if the court determines that proper interpretation of the contract depends upon evidence outside the contract itself. *Id.* None of the parties here contends that extrinsic evidence is at issue; instead, they have merely presented two competing versions of what the parties intended by the disputed language in the Dodek contracts.

■■■■ We have reviewed the record, as well as the competing interpretations of the contracts advanced by the Dodeks and appellees. We conclude, as did the trial court, that the Dodek contracts as written are integrated, unambiguous, speak for themselves, and thus can be interpreted as a matter of law.

### C.

We turn to the question whether, as a matter of law, the trial court correctly entered judgment in appellees' favor. *Taylor*, 482 A.2d at 357; *Holland*, 456 A.2d at 814; *see* Super.Ct.Civ.R. 56(c). Whether appellees are entitled to judgment rests upon the proper application of the disputed "most favored nation" clause and related language in the Dodek contracts to the undisputed facts.

■■■■ We realize that the two questions relevant to summary judgment—whether there is a genuine issue of material fact as to the meaning of a contract, and whether a contracting party is entitled to judgment as a matter of law—commonly merge when the court has to decide whether extrinsic evidence is necessary to determine, for example, the parties' intent. As noted above, following a common convention, we treat the question of contractual interpretation, beginning with the question of ambiguity, as one of law—alert, however, to the possibility that a factual dispute about the contracting process can throw the inquiry back beyond interpretation to a factual inquiry negating summary judgment. We proceed in this manner.

Fundamentally, when interpreting a contract, "the court should look to the intent of the parties entering into the agreement." *Intercounty Construction Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C.1982) (citing *District of Columbia Department of Housing and Community Development v. Pitts*, 370 A.2d 1377, 1380 (D.C.1977)).

> Analytically, of course, the question of what the parties intended is clearly a question of fact. But the courts have long called it a question of law. The reason is not that it is a question of law in the literal sense, for it is a question of fact in the literal sense, but the reason is that the judge is better qualified than the jury to interpret the written language.

*1901 Wyoming Avenue Cooperative Association v. Lee*, 345 A.2d 456, 461 n. 8 (D.C.1975) (quoting 4 K. DAVIS, ADMINISTRATIVE LAW § 30.02 at 197 (1958)).

■■■■ The way we typically inquire into intent as a legitimate question of law, not of fact, is to recognize that intent is properly an objective, not subjective, issue. *See Flippo Construction Co., Inc. v. Mike Parks Diving Corp.*, 531 A.2d 263, 269 (D.C.1987). Accordingly, "[t]he first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty*, 443 A.2d at 32. The following factors are to be considered in making the reasonableness determination:

> First, there is the presumption that the reasonable person knows all the circumstances surrounding the making of the contract. Secondly, the reasonable person is bound by all usages which either party knows or has reason to know. Thirdly, the reasonable person standard is applied both to the circumstances surrounding the contract and the course of conduct of the parties under the contract.

*Id.* (citing *1901 Wyoming*, 345 A.2d at 461–62). To understand what a "reasonable person" in the position of the parties to the Dodek contracts would have thought, it is necessary to review the undisputed circum-

stances under which the Dodek contracts were negotiated.

The Dodek contracts were negotiated for the sellers by Oscar Dodek and by the Dodeks' attorney, Harry Friedman, and for the purchasers by Stuart Bernstein and by Mason, Bernstein, and Cohen's attorney, C. Richard Beyda. In the trial court proceeding, Dodek and Friedman gave depositions, the Dodeks filed an affidavit by Friedman, and appellees presented the affidavits of Bernstein and Beyda. Through these documents, the trial court received evidence from all four participants in the Dodek contract negotiations.

It is undisputed that both Dodek and Bernstein were experienced businessmen and that each was assisted in the contract negotiations by competent legal counsel. Furthermore, both parties were well aware of the business climate in which their negotiations were taking place. Both parties knew that the Pennsylvania Avenue corridor was undergoing redevelopment, that the Dodek lots lay within the redevelopment zone, and that individual lots in Square 348 were being assembled into larger parcels to facilitate development of the block. In that context, each party entered the contract negotiations with a specific and predictable goal. For Mason, Bernstein, and Cohen, the goal was to obtain the Dodeks' lots pursuant to MBC's plan to purchase and develop the eastern half of Square 348. For the Dodeks, aware of PADC's power of eminent domain and knowing that their lots would necessarily be subsumed by the development project, the goal was to obtain the highest available price for their land.[9]

The record demonstrates that the Dodeks consciously chose to sell their lots outright, rather than to participate in an ongoing way in the development of Square 348. Mason, Bernstein, and Cohen, through MBC, initially made the Dodeks an offer similar to that accepted by the owners of Lot 800: MBC offered the Dodeks a share in the partnership in exchange for their property. This arrangement would have permitted the Dodeks, as partners in MBC, to participate in any future profits MBC might realize through MBC's development of Square 348 or through the sale of MBC's partnership assets to another developer. The Dodeks, however, were dissatisfied with the terms of the deal MBC offered and chose instead to sell their property in return for cash, relinquishing any possibility of further participation in the development project.

Despite the Dodeks' decision to sell outright rather than to join as partners in MBC, the record shows that they sought to guarantee themselves some share in the inflation of land prices anticipated as assembly of Square 348 progressed. Although unwilling to assume the risks associated with full participation in the venture, the Dodeks recognized that if the development of Square 348 proceeded successfully, land values in the Square could be expected to increase. Accordingly, their neighbors who held out, selling later, would likely receive higher prices for their property than the Dodeks had received for theirs. The Dodeks assert that "[i]n negotiating the contracts, the Dodeks wished to assure that the price they received per square foot for each of their lots would equal the highest price paid per square foot for any of

---

9. The Dodeks place considerable emphasis on the fact that they apparently sold their land under threat of condemnation by PADC. Although the Dodek contracts stipulated that the sellers were selling under the threat of condemnation, the record shows that this language was added at the Dodeks' election to facilitate favorable tax treatment of the capital gain the Dodeks received as a result of the sale. PADC indeed had the power to condemn the Dodeks' lots, but there is no indication that the threat of condemnation was imminent. To the contrary, the evidence showing the various ways and dates at which owners of other lots in Square

348 disposed of their property gives some indication of the range of options that were also available to the Dodeks at the time. We are unpersuaded by the Dodeks' allegation that Mason, Bernstein, and Cohen withheld from them information about the range of available options. Mason, Bernstein, and Cohen were under no obligation to provide the Dodeks with free legal or business advice, particularly in light of the fact that the Dodeks were represented by competent counsel. Moreover, the Dodeks have not raised a claim of fraud or duress in the making of the contracts.

the lots subsequently acquired for development in the square." Thus, the "most favored nation" clause was added to the Dodek contracts, providing that if Mason, Bernstein, and Cohen, individually or through MBC, paid more for any of the neighboring lots, "the purchase price hereunder shall be increased to equal the highest cost to them per square foot for any other property in Square 348...."

We note, as do the parties, that a "most favored nation" clause is unusual in the context of a real estate contract. This fact, however, does not affect our analysis. In the business context in which the Dodek contracts were negotiated, the "most favored nation" clause was a logical addition. The clause allowed the Dodeks to sell their lots early but still to benefit from any escalation in land prices that might occur as the land assembly progressed. Conversely, Mason, Bernstein, and Cohen—although potentially obligating themselves to pay appellants more than initially bargained for—were able, by agreeing to the "most favored nation" clause, to obtain the three Dodek lots immediately, thereby eliminating the risk that the Dodeks would hold out and increasing the odds that MBC's land assembly would ultimately succeed.

Against this background, we consider in turn each of the three so-called "triggering events," in order to determine whether any of those transactions, as a matter of law, invoked the "most favored nation" clause.

## IV.

### A.

The Dodeks' first contention concerns MBC's June 1980 settlement on the May 1979 contract for the purchase of Lot 820. Their argument rests on the notion that, because the contract for Lot 820 did not obligate the purchasers to pay the full purchase price unless they elected to go to settlement, the contract should be treated as an option contract and thus that the date of "purchase," for purposes of construing the "most favored nation" clause, should be the date of the eventual settlement—eight months after the Dodek contracts. We agree.[10]

In support of their contention, the Dodeks cite a number of cases from other jurisdictions, most notably Maryland, that have treated contracts similar to the Lot 820 contract as an option to purchase, not as a purchase itself.[11] Although the question is apparently one of first impression in this jurisdiction, we conclude that the Maryland courts' treatment of such contracts is persuasive. The Maryland Court of Appeals, in *Green Manor Corp. v. Tomares,* 266 Md. 472, 295 A.2d 212 (1972), concluded that where a contract "give[s] the purchaser the option and privilege to 'choose between consummating the purchase on the agreed upon terms or of walking away, for any reason or no reason, with no obligation or liability whatever save the loss of his [or her] deposit[,]' " the contract is an option, and not a purchase-and-sale agreement. *Id.* 295 A.2d at 214 (quoting *Dixon v. Haft,* 253 Md. 692, 696, 253 A.2d 715, 718 (1969)); *see also Schlee v. Bryant,* 247 Md. 689, 234 A.2d 457, 460 (1967). The court reasoned in *Green Manor* that because, under the contract, the purchaser had no liability except forfeiture of its deposit if there were no settlement, and because the seller had no recourse but to keep that amount, the agreement was merely an option to buy. The language at issue in *Green Manor* was strikingly similar to the language in the Lot 820 contract. In *Green Manor,* 295 A.2d at 213, the relevant paragraph reads:

> If Purchaser shall refuse or fail to make settlement, although all conditions precedent to settlement have been complied with, said deposit of TWENTY THOU-

---

**10.** As to the Lot 820 transaction, we reverse summary judgment for appellees and grant judgment in the Dodeks' favor. In doing so, we have considered the evidence in the light most favorable to appellees (the non-moving party in appellants' motion for summary judgment). *Taylor v. Eureka Inv. Corp.,* 482 A.2d 354, 357 (D.C.1984); *Holland v. Hannan,* 456 A.2d at 815; *see* Super.Ct.Civ.R. 56(c).

**11.** It is interesting to note that in at least one of those Maryland cases, the law firm of Mason, Bernstein, and Cohen's attorney, C. Richard Beyda, was involved.

SAND DOLLARS ($20,000.00) shall be retained by the Seller as agreed, as liquidated damages ... and the parties shall be relieved of further liability hereunder.

The Lot 820 contract, in comparison, reads:

In the event of the failure by Purchasers to perform [their] obligations hereunder, even though all conditions precedent as herein specified are satisfied, then the Sellers' sole remedy shall be to forfeit the Purchaser's deposit [$50,000] made hereunder ... and the Purchasers and Sellers shall have no further liabilities to each other.

Because we see no relevant distinction between these two provisions, and because we are in accord with the Maryland court's reasoning, we conclude that the Lot 820 contract was an option contract, not a purchase-and-sale agreement.

■ We therefore turn to the question whether the purchase of Lot 820, pursuant to the "option" contract, triggered a price increase under the Dodek contracts' "most favored nation" clause. We conclude, as a matter of law, that it did. Because we treat the contract for Lot 820 executed in May 1979, as an option contract, we must look to the date of settlement as the date of the purchase for purposes of the "most favored nation" clause. Settlement on Lot 820 occurred in June 1980, when MBC purchased the lot at a cost of $200 per square foot. This was a cost to Mason, Bernstein, and Cohen of $45 per square foot more than they had agreed to pay for the Dodek lots with the same frontage in October 1979. Under the plain language of the "most favored nation" clause, therefore, the Dodeks are entitled to a $45 per-square-foot increase in the price paid to them for lots 819 and 20.[12]

### B.

■ The Dodeks' second contention is that the 99–year ground lease of the Morrissette lot triggered the "most favored nation" clause. We conclude that this clause cannot be read to include a lease. The language of the clause—"acquiring ownership, either by purchase or through condemnation"—is unambiguous. Moreover, the record shows that the Dodek contracts were skillfully and meticulously negotiated and that drafts of the contract were repeatedly modified and refined. Applying the reasonable person standard set forth in our decision in *Intercounty*, we conclude that a reasonable person in the position of the parties to the Dodek contracts would have understood the words "by purchase or through condemnation" to mean just what they said and would have inserted the word "lease" if indeed leases were meant to come within the scope of the clause.

The Dodeks submit that the "most favored nation" clause must be read in conjunction with paragraph five of the Dodek contracts, which warrants that the Dodeks sold their land under threat of condemnation by PADC. *Phenix–Georgetown, Inc. v. Chas. H. Tompkins Co.*, 477 A.2d 215, 225 (D.C.1984) (general rule is that contracts will be read as a whole, and every part will be interpreted with reference to the whole); *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199, 205 (D.C.1984) (writing must be interpreted as a whole, giving a reasonable, lawful meaning to all its terms). While we agree that the contract must be read as a whole, we are unpersuaded that the language of paragraph five can be read to alter the plain meaning of the "most favored nation" clause. Paragraph five merely sets forth the understanding of the parties that if the Dodeks did not voluntarily convey their land, PADC would ultimately condemn it on behalf of the developer. *Supra* note 9. Nowhere does paragraph five exclude the possibility that land in Square 348 could be conveyed through the mechanism of a lease instead of a sale. More than likely, the term "lease" does not

12. The "most favored nation" clause in the Dodek contracts for Lot 819 and Lot 20, fronting on 10th Street, states clearly, "The Purchasers agree that in the event the cost to them of acquiring ownership ... by purchase ... of any other property in Square 348 fronting on 10th Street, N.W., [is] for a price in excess of $155 per square foot, the purchase price hereunder shall be increased...."

appear in paragraph five because a lease was not contemplated as a means of conveying the Dodeks' lots. This court, therefore, cannot logically construe the omission of the word "lease" in paragraph five as constructively adding the word "lease" to the language of the "most favored nation" clause.

Furthermore, contrary to the Dodeks' argument, while the Morrissette lease does convey some of the incidents of ownership, it does not convey the essential element, namely fee simple ownership itself. MBC is not free to dispose of the property, and, unless MBC exercises the right under the lease to purchase the lot, it will inexorably revert to the Morrissettes (or to their successors) at the end of ninety-nine years. Under these circumstances, we cannot conclude that MBC has obtained "ownership" of the Morrissette lot for purposes of the "most favored nation" clause.

## C.

The Dodeks' final contention is that the "most favored nation" clause was triggered when CF 16 Corporation, as owner of MBC, acquired partnership assets consisting of assembled lots in the western half of Square 348. Setting aside for the moment the question whether CF 16, which was not an original party, can be held liable under the Dodek contracts, we look first to whether the "most favored nation" clause could have been triggered by the transaction at issue. We conclude, as a matter of law, that it could not. The "most favored nation" clause refers explicitly to "the cost of acquiring ownership ... of any other lot...." CF 16, however, when it purchased the partnership assets of the Clark and Evans partnerships, bought more than just lots. In addition to lots, CF 16 acquired the intangible benefit of the preliminary work Clark and Evans had done to facilitate the development of Square 348. By the time CF 16 purchased the assets of the Clark and Evans partnerships, the partnerships had already completed the difficult task of negotiating with each individual lot owner to acquire their property and had assembled the various lots to create a single, development-ready parcel. More-

over, the partnerships had formulated and submitted to PADC a comprehensive proposal for the development of Square 348. CF 16 accordingly acquired from the partnerships not just land but a complete development package.

From the vantage point of a reasonable person in the position of the parties, *Intercounty*, 443 A.2d at 32, the plain intent of the "most favored nation" clause was to ensure that the Dodeks received as good a deal as any of their individual neighbors did when they sold their lots to the developers of Square 348. The clause clearly does not contemplate that once all of the individual lots had been concentrated in the hands of the developers, the Dodeks should continue to receive the benefit of every subsequent sale from developer to developer as the land improvement project progressed. The trial court characterized the Dodeks' argument with respect to this third alleged "triggering event" as:

> strained, convoluted, failing to recognize the difference in value between individual parcels of land v. property assembled through the work and risks of the partners, not within the reasonable business context of square 348 assembly, not consistent with the Dodek contracts as written ..., and legally and temporally interminable.

We concur in the trial court's assessment.

## V.

The Dodeks seek to impose liability not only on Mason, Bernstein, and Cohen, the original purchasers of the Dodek lots, but also on MBC, their successor and assign, and on CF 16 and its partnership, 1001 Pennsylvania Avenue Associates, as successors in interest to MBC. To that end, the Dodeks have devoted a considerable portion of their briefs and argument to describing the complex legal relationships among the various parties.

At the time of the first alleged "triggering event"—the Lot 820 transaction—MBC was wholly owned by Mason, Bernstein, and Cohen. By the time of the second and third alleged "triggering events"—MBC's

lease of the Morrissette lot and CF 16's purchase of the Clark and Evans partnerships—MBC was owned by CF 16. MBC also eventually became a partner in 1001 Pennsylvania Avenue Associates.

As we have noted, *supra* note 6, the Dodeks' attempt simultaneously to impose liability upon MBC for the Morrissette lease and upon CF 16 for the Clark and Evans partnership purchases is logically inconsistent.[13] The Dodeks urge us to conclude that MBC is liable under the Dodek contracts and, at the same time, urge that MBC's alleged "successor and assign," CF 16, is liable as well. Obviously, MBC could not be liable if CF 16 had succeeded to and become the assignee of MBC's obligations and liabilities under the Dodek contracts. We need not decide, however, whether CF 16 and 1001 Pennsylvania Avenue Associates can be held liable under the Dodek contracts, for we have rejected the Dodeks' second and third arguments; we have concluded, as a matter of law, that neither of the two alleged "triggering events" which took place after CF 16's acquisition of MBC —the 99–year lease of the Morrissette lot and CF 16's acquisition of the Clark and Evans partnerships—could have triggered a price escalation under the Dodek contracts' "most favored nation" clause. We conclude that the only event that did trigger that clause was MBC's purchase of Lot 820. Because the Lot 820 transaction predates the sale of MBC's assets to CF 16, we need only address the relationship between Mason, Bernstein, and Cohen and the present MBC partnership to determine whether the new partners bear any liability for the obligations of the old.

■ At the time of the Lot 820 transaction, Mason, Bernstein, and Cohen were the only partners in the MBC partnership.

Thus, it is irrelevant whether we hold the three liable in their individual capacities, as the "purchasers" under the Dodek contracts, or in their capacities as the partners in MBC, the purchasers' "successor and assign." Moreover, we conclude that the MBC partnership owned by Mason, Bernstein, and Cohen dissolved when it was purchased by CF 16 and reconstituted as a new business entity. Because we find no evidence in the record that the present partners in MBC, all subsidiaries of Cadillac–Fairview, assumed the obligations previously incurred by the old MBC, we find no grounds on which to impose liability on the present MBC partnership, or on CF 16 Corporation.[14]

■ The Dodeks cite D.C. Code § 41–116 (1981) for the proposition that the new partners in MBC are liable for the obligations of the old. Section 41–116 reads:

A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred except that this liability shall be satisfied only out of partnership property.

The Dodeks reliance on § 41–116 is incorrect. Section 41–116 presupposes an ongoing enterprise, altered only by the addition of a new partner. The admission of CF 16 as a partner in MBC, however, marked a transformation of the partnership far more radical than simply the addition of a new member. In fact, during the series of transactions that resulted in the transfer of MBC's assets to CF 16, MBC was, as a legal matter, dissolved and reconstituted with new members, a new business pur-

---

13. We recognize, of course, as set forth *supra* note 6, that the Dodeks likely intended their arguments to be read in the alternative. Nonetheless, for the sake of clarity, we note the inconsistency here.

14. Even assuming, contrary to our holding, that the present MBC partnership is a continuation of the old MBC, CF 16 would, nonetheless, apparently be insulated from liability. Mason, Bernstein, and Cohen, when they sold their in-

terests in MBC to CF 16, specifically warranted that MBC had no outstanding liabilities and agreed to indemnify CF 16 against all debts and liabilities arising from transactions conducted by MBC before CF 16's ownership. Thus, by the terms of the CF 16 contract, CF 16 apparently would have the right to recover from Mason, Bernstein, and Cohen any sum assessed against them in this lawsuit for transactions predating CF 16's purchase of MBC.

pose, and a wholly amended partnership certificate.

> D.C.Code § 41–128 (1981) provides that: The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business.

It is well established in jurisdictions which, like the District of Columbia, have adopted the Uniform Partnership Act, that a partnership may be dissolved by the mutual will of the partners. *See Babray v. Carlino,* 2 Ill.App.3d 241, 276 N.E.2d 435, 442 (1971); *Meyer v. Sharp,* 341 Ill.App. 431, 94 N.E.2d 510, 514 (1950); *Craig v. Hamilton,* 213 Kan. 665, 518 P.2d 539, 543 (1974) (dissolution occurs at the point when the partners cease to seek business as a partnership); *Casner v. Oldham,* 279 S.W.2d 252, 255–56 (Ky.1955); *Cave v. Cave,* 81 N.M. 797, 474 P.2d 480, 484 (1970); 59A Am.Jur.2d *Partnership* § 812 (1987); 68 C.J.S. *Partnership* § 334 (1950 & 1978 Supp.). Dissolution also may be caused "[b]y the termination of the definite term or particular undertaking specified in the [partnership] agreement." D.C.Code § 41–130(1)(B) (1981). Applying these definitions, we believe it is clear that MBC underwent dissolution in the course of the transfer of MBC's assets to CF 16.

▪ That transfer was accomplished in three steps. First, on April 7, 1981, Mason, Bernstein, and Cohen, as well as the Lot 800 partners, assigned all their limited partnership interests in MBC to CF 16. In this transaction, CF 16 acquired a 97% interest in MBC. It is clear that at that point MBC experienced a "change in the relation of the partners caused by [a] partner ceasing to be associated in the carrying on ... of the business." D.C.Code § 41–128. Although Mason, Bernstein, and Cohen continued as general partners, all of the original limited partners had withdrawn from the partnership. Thus, on April 7, 1981, the original MBC partnership was legally dissolved.

▪ Second, on April 8, 1981, MBC's Certificate of Limited Partnership was again amended to reflect CF 16's admission as a general partner, and Mason, Bernstein, and Cohen's retirement as such. The Dodeks point out that in the amendment agreement CF 16, as the remaining general partner, elected "to continue the Partnership and the business of the Partnership" and specified that "accordingly, the Partnership shall not be dissolved and the Partnership and the business of the Partnership shall be continued." The Dodeks contend that, by this language, CF 16 obligated itself to assume the debts that MBC had previously incurred. This argument, however, ignores, the fact that the original MBC already had been dissolved. Irrespective of CF 16's intent, the language of the April 8 amendments cannot be read to do any more than merely preserve the MBC that came into existence on April 7, when CF 16 acquired all of the limited partnership interests in MBC.

MBC was altered a third time when CF 16 amended the certificate of limited partnership to redefine MBC's business purpose and to rearticulate the relationships among the partners—now CF 16 and its affiliate.

▪ Despite the dissolution of MBC, CF 16 could have elected to assume the partnership debts and continue the partnership business. CF 16 did not do so. D.C. Code § 41–140(d) (1981) provides:

> When all the partners or their representatives assign their rights in partnership property to 1 or more 3rd persons *who promise to pay the debts and who continue the business of the dissolved partnership,* creditors of the dissolved partnership are also creditors of the person or partnership continuing the business.

(Emphasis added.) Thus, under this section, CF 16 could only be held liable for MBC's preexisting debts if CF 16 had "promise[d] to pay the debts" of the dissolved MBC partnership. CF 16, however, assumed no such duty. The contract of sale for MBC's assets requires that "[o]n the closing date, the Partnership [MBC] shall have no liabilities or obligations, fixed or contingent, and shall not be a party to any contract or commitment that has not

been fully performed...." Furthermore, the letter agreement between Mason, Bernstein, and Cohen and Cadillac–Fairview setting forth the terms of the sale of MBC's assets specifies that Mason, Bernstein, and Cohen agree to indemnify Cadillac–Fairview (and its subsidiaries) against all preexisting liabilities and obligations of MBC. Finally, nothing in the first amended certificate of partnership transferring the limited partnership interests to CF 16 suggests that CF 16 "promise[d] to pay the debts." Moreover, it is unclear that CF 16 could be deemed to have "continued the business of the dissolved partnership" since the partnership certificate was amended on April 9, 1981, to reflect a change in MBC's business purpose from acquiring new real estate to holding title to existing lots.

For the reasons set forth above, we find no record basis on which CF 16, 1001 Pennsylvania Avenue Associates, or the present MBC partnership may be held liable for the Lot 820 transaction.[15]

### VI.

Accordingly, we affirm in its entirety the grant of summary judgment as to appellees CF 16 Corporation, 1001 Pennsylvania Avenue Associates, and MBC. As to appellees Mason, Bernstein, and Cohen, we affirm summary judgment with respect to the Morrissette lease and to CF 16's acquisition of the Clark and Evans partnerships, but we reverse as to the acquisition of Lot 820. With respect to that transaction, we remand for entry of judgment in favor of the Dodeks in the amount properly computable by reference to the "most favored nation" clauses in the Dodek contracts applicable to Lots 819 and 20.

*Affirmed in part, reversed in part, and remanded.*

---

**15.** We note that the owners of Lot 800 joined MBC as partners after the purchase of Lot 820 and before the sale of MBC's assets to CF 16. However, we need not—and do not—decide whether the Lot 800 partners may be held liable for the Lot 820 transaction. None of the Lot 800 partners is a party to this lawsuit; therefore, this issue of potential liability is not before us.