2 Ill. App.3d 241 (1971)
276 N.E.2d 435
STEPHANIE BABRAY, Plaintiff-Appellee,
v.
CHARLES C. CARLINO, Defendant-Appellant.
No. 54441.
Illinois Appellate Court  First District.
November 8, 1971.
*242 *243 Robert A. Sprecher, of Chicago, (Crowley, Sprecher, Barrett & Karaba, of counsel,) for appellant.
Lowell B. Komie, of Chicago, (Stiefel, Burns, Levinson & Komie, of counsel,) for appellee.
Decree and judgment reversed and cause remanded; dismissal of counterclaim affirmed.
Mr. JUSTICE GOLDBERG delivered the opinion of the court:
Charles C. Carlino (defendant) appeals from a decree granting an accounting and other relief to Stephanie Babray (plaintiff) and dismissing his counterclaim. This appeal is concerned only with three portions of the decree which will shortly be described. Plaintiff did not cross appeal from that part of the decree which denied her claim for additional relief. The decree was entered in accordance with the report and recommendations of a master in chancery.
The decree established a constructive trust in favor of plaintiff and granted her an accounting in connection with an interest in the Niles Motel. This was in accordance with recommendations of the master who found that defendant had violated his duty of loyalty to plaintiff as a copartner. Another portion of the decree granted plaintiff an interest allowance for use of her funds by defendant. The master predicated this recommendation upon a contract relationship between the parties based upon an oral agreement for purchase of bank stock by defendant for plaintiff. The remaining portion of the decree involves a recommendation by the master that defendant be denied damages for willful and malicious prosecution of the suit by plaintiff. In this regard, the master stated that the defendant's counterclaim had not been proved. We will consider these three phases of the appeal in their stated order. First, however, a factual statement is essential.
 1 Since proceedings before masters in chancery no longer exist, it might be wise briefly to consider the duty of the reviewing court and its relation to the findings of fact made by a master and then approved by the entry of a decree by the trial court. A master had the opportunity of observing the witnesses and of hearing their testimony in person. For this reason, the rule existed that findings of the master, particularly *244 when approved by the trial court, are entitled to due weight on review of the cause. Kolze v. Fordtran, 412 Ill. 461, 468, 469; Englestein v. Mackie, 35 Ill. App.2d 276, 287.
 2-4 The concurrent principle also obtains that a report by a master is advisory only. After the master's report has been filed, the facts remain open for consideration by the trial court and by the reviewing court. (Uksas v. Zelensky, 21 Ill.2d 303, 311; Vesolowski v. Vesolowski, 403 Ill. 284, 292; Miller v. Heller, 106 Ill. App.2d 383, 393.) In a chancery case, the reviewing court proceeds in accordance with equitable principles. Therefore, the facts are always open for consideration on appeal and the question to be determined here is: "Was the decree rendered by the court a proper one under the law and the evidence?" (Uksas v. Zelensky, 21 Ill.2d 303, 311.) This question is to be answered by us without regard to the finding of the master upon any particular question of fact. (Chechik v. Koletsky, 311 Ill. 433, 438. See also Miller v. Heller, 106 Ill. App.2d 383, 393-94.) With these established and salutary principles in mind, we proceed with a statement of the facts.
Defendant's business experience began in 1918. For about 19 years prior to the events here, he was Vice President of the Belmont National Bank (Bank). Plaintiff's formal education ended after one year of high school. She was first married when 19 years old. About 1946, plaintiff purchased a tavern in Chicago. She borrowed money with which to start this enterprise. She first operated the business with a partner but bought out the partner's interest. Plaintiff's husband died in July of 1953 and she sold the tavern during the following year. Plaintiff thus had some experience in financial matters such as operation of the tavern and the purchase and sale of a two-flat building in Chicago. In addition, plaintiff had made a small purchase of corporate stock before she met defendant. The adjectives "alert", "intelligent" and "articulate" appear in the record as descriptive of plaintiff.
In 1948, defendant had become acquainted with plaintiff's first husband who was a depositor in the Bank. In 1952, plaintiff accompanied her husband to the Bank and there first met defendant. In 1953, some two weeks after the death of the first husband, in response to a telephone call from plaintiff, defendant came to visit her at her home. She was still operating the tavern then and in the course of her business had occasion to visit the Bank and sometimes to see defendant.
At the time of the death of plaintiffs first husband, in July of 1953, she was assisted by her brother who was a practicing attorney. On the day after the death, accompanied by her brother, she removed cash and other items from a safety deposit box in the Bank and opened a new box. In addition, she transferred the entire amount in a joint savings *245 account, some $7700, to a new account in her own name. Thereafter, in 1954, plaintiff removed $16,650 from a safety deposit box in the Bank and deposited it in her savings account. She testified that defendant advised her to do this; and that, at defendant's suggestion, she opened this account using her middle name and her maiden name in combination.
During 1953 and 1954, on three separate occasions, plaintiff purchased a total of $6000 in treasury bonds through the Bank. These transactions were handled by means of cashier's checks issued by the Bank. Her testimony is that defendant first talked to her about these bonds in October of 1953. At that time, she bought $3000 worth of bonds. A few days later, defendant gave plaintiff a refund of $89 representing the excess of her payment above the actual cost of the securities.
Plaintiff testified that in each instance she expressly authorized defendant to purchase United States treasury bonds for her. She owns $6000 worth of these bonds to the present day and has received all installments of interest thereon. She also asked defendant to buy her $5000 worth of these bonds in October, 1957, but she disposed of them later without consulting defendant. A finding by the master that defendant bought and sold treasury bonds without plaintiff's prior knowledge by drawing from and depositing to her bank account is completely unsupported by the evidence. In addition, after discussion, plaintiff authorized defendant to buy 241 shares of stock in the Bank for her for some $6000. She still owns this stock which has increased to 349 shares because of stock dividends. The value of the stock is now approximately doubled. In each instance, these stock investments were discussed between the parties and expressly authorized by plaintiff.
Plaintiff gave defendant possession of her bank books and various personal papers including her certificates of stock in the Bank. Defendant testified that this was done as a matter of convenience. In addition, it is certain that she gave defendant possession of a blank savings withdrawal slip signed by her for an account in the Bank in her correct name and another such withdrawal slip for the account maintained in her middle and maiden names. Both of these slips were later returned to plaintiff unused and were destroyed by plaintiff at defendant's suggestion. There is a suggestion in the master's report that defendant had possession of additional similar deposit slips. Plaintiff testified that she signed at least half a dozen such slips. However, defendant denies this and only his possession of two slips as above described is documented, as will hereinafter be shown. There is no evidence that defendant ever used any withdrawal slip signed in blank by plaintiff. The only withdrawal slip offered in evidence is entirely in plaintiff's handwriting.
During October of 1956, plaintiff visited defendant at the Bank. At *246 that time, defendant gave her all of the documents and papers of every kind that she had previously lodged with him. Plaintiff tendered to defendant, and she signed, an itemized receipt listing the documents. More than 30 items are described in the list. The list includes an installment note and trust deed representing the third mortgage on the Niles Motel (later fully described) in the amount of $30,000 and all stock certificates. This list specifies a blank savings withdrawal slip signed by plaintiff in her proper name and one signed by her in the combination of her middle and maiden names.
The record does not clearly divulge the background or the reason for this incident. After Christmas of 1954, there was an argument between the parties in which defendant accused plaintiff of drinking too much. This incident apparently heralded the development of a rift between them. Defendant testified that, about this time and later, plaintiff would come to the Bank and insult him. In any event, new transactions between the parties virtually ceased with delivery of the documents to plaintiff. Subsequently, plaintiff engaged in certain financial transactions such as purchase of additional stock in the Bank. In these instances, she acted without advice or consultation with defendant.
We will now state the facts and consider the rights of the parties with reference to the Niles Motel transaction. This portion of plaintiff's claim is set forth in the fifth and last count of plaintiff's third amended complaint. During November of 1954, defendant was confined to the hospital. Plaintiff went to visit him and there, by chance, met Monteen Alongi who had come to the hospital for the same purpose. Plaintiff testified that prior to this time defendant had spoken to her in a general way about the possibility of investing in a motel or hotel. Plaintiff and Mrs. Alongi left together and spoke about the motel. Mrs. Alongi, plaintiff and defendant later discussed the venture together. Plaintiff testified that she was told by defendant that the price of the motel would be $250,000; that she would receive a one-third interest for putting up all the money that she could; that defendant and Mrs. Alongi would be her partners; and that Mrs. Alongi would run the motel and plaintiff would run the bar. The balance of the purchase price would come from a contribution by defendant and from mortgage financing. Prior to this time, Mrs. Alongi had taken plaintiff to see the motel.
Plaintiff invested some $30,000 in the purchase of the motel. She withdrew approximately $7000 from her savings account in the Bank. She made a loan from the Bank for $6500 collateralized by 100 shares of other stock which she owned. In addition, she borrowed some $14,000 by a mortgage on her home. She testified that defendant suggested these loans to her and that he told her that he would arrange the loan from *247 the Bank at the lowest possible rate of interest. Plaintiff specifically approved of this investment and of the manner in which it was consummated.
Defendant worked at the motel at night in addition to continuing his duties at the Bank. Mrs. Alongi resided on the premises and acted as manager. Plaintiff did not manage the tavern which was rented out to other persons. Plaintiff testified that she received no documentary evidence of her interest in the motel until the early part of 1956. During November or December of 1955, plaintiff had become concerned about this. She took the matter up with an attorney to whom she had been referred by defendant. In due course, the lawyer gave her papers indicating that she held a third mortgage on the motel property for $30,000. Plaintiff did testify that she received some "closing papers, the papers that came from the sale" but these documents were never produced. The evidence shows that the motel property was owned by a land trust and that the beneficial interest was owned one-third each by plaintiff, Mrs. Alongi and defendant's son.
The motel was purchased during August of 1955. It was located on North Milwaukee Avenue in Niles, Illinois. At the time of purchase, it consisted of 25 motel units, 14 hotel rooms and a tavern. No contract of purchase was ever produced before the master. It is clear, however, that there was a first mortgage on the property in the amount of $140,000. There was a second mortgage held by the seller in the amount of $30,000. Plaintiff received a third mortgage for $30,000 and Mrs. Alongi contributed $15,000 borrowed from an outside source. This makes a total of $215,000 which the master found was the entire purchase price of the property. Defendant insists that the purchase price was actually close to $250,000 and that he contributed part of the cost. However, defendant submitted no documentary evidence of this and stated that he did not remember the amount that he actually contributed.
It is agreed, however, that the property was owned by three partners; namely, plaintiff, Mrs. Alongi and defendant's son, Charles C. Carlino, Jr. It is undisputed that defendant's son made no financial contribution to the venture. He acted as a nominee for his father. The master found that the son was the alter ego of the father and no objection was made to this finding.
Some time after the purchase, problems arose in connection with management and operation of the motel. Plaintiff wished to operate the tavern and Mrs. Alongi refused to permit this. Defendant testified that he asked plaintiff if she would accept her investment back plus a profit of $10,000 and he told her that he would accept the same. He stated that he told plaintiff that Mrs. Alongi would borrow money to be able *248 to pay both of them off on this basis. Plaintiff testified that defendant told her on the telephone that there was a chance to sell the motel and he asked if she would be satisfied if she got her money back plus $10,500. Plaintiff asked for time to think it over.
Defendant testified that Mrs. Alongi later agreed that she would borrow the necessary funds and buy out plaintiff and defendant so that each could receive a profit. Defendant said he wanted to leave the motel entirely because it took too much of his time. Plaintiff then agreed that she would accept return of her investment plus a profit or bonus of $10,500 for her entire interest in the motel. This took place about November of 1956.
In the transaction, plaintiff was represented by counsel of her own choice. She first called a lawyer whom defendant had previously recommended. He stated that he would not represent plaintiff or defendant in the transaction. Plaintiff then herself, without knowledge of defendant, selected a reputable and experienced member of the bar to represent her. She was not certain whether she knew him through her contact with her brother, also a member of the bar. Plaintiff had a financial statement regarding the operation and status of the motel.
During late November of 1956, a meeting was held in the office of plaintiff's counsel. Defendant, his son and another attorney were present. At that meeting, plaintiff, Mrs. Alongi and defendant's son all signed a written agreement dated November 21, 1956. This document recited that the parties were beneficiaries under a trust agreement and that they had operated the Niles Motel as a copartnership which they wished to dissolve; with defendant's son and plaintiff to withdraw and with Mrs. Alongi to remain in the business. It also recited that all matters of every kind between the parties had been "settled and adjusted." The parties agreed that Mrs. Alongi would pay defendant's son and plaintiff each the sum of $10,500, receipt of which they acknowledged, in full payment of all of their rights of every kind in the real estate, personal property and business of the Niles Motel. In addition, each of the parties released and discharged the other from all claims and demands in connection with the copartnership and the motel. This document was witnessed by both of the attorneys and by defendant.
Two days later, on November 23, 1956, both attorneys entered into an escrow agreement at Chicago Title & Trust Company. This agreement recited that the sum of $50,000 was to be deposited in a separate money lender's escrow and detailed directions to the escrowee were set forth. The escrowee was to pay plaintiff the entire amount due on the third mortgage plus interest, plus the sum of $10,500. A sufficient sum was to be paid for release of the then existing second mortgage and the balance *249 was to be paid to the corporate trustee which held legal title to the motel property under a land trust. However, the necessary loan never materialized and the money required to consummate this escrow agreement was never deposited.
On November 29, 1956, the transaction was finally completed in a slightly different form. It is undisputed that plaintiff received $37,134 at the time of closing. This represented the entire balance of her third mortgage plus interest and also her bonus or profit in the amount of $10,500. Plaintiff had previously received eight monthly payments of principal and interest on the third mortgage each in the amount of $579.99, being a total of $4,639.92. Therefore, the total amount of principal and interest realized by plaintiff was $41,773.92.
This sum was delivered to plaintiff and her counsel by means of a check issued by an attorney named Meyer Rosin who had represented Carlino, Jr. This lawyer testified that on the preceding day he had received $37,134 from defendant's son; and, in turn, he had issued his check for the same amount payable to plaintiff. He also testified that the Carlino interest was sold out concurrently with the sale of plaintiff's interest. He testified that plaintiff and defendant first wanted to sell their entire interest to Mrs. Alongi. She was unable to obtain the necessary funds and the escrow was thereupon terminated. He testified that some settlement was arranged outside of his office between defendant and Mrs. Alongi. Defendant testified that he received a note from Mrs. Alongi representing his interest. However, this obligation was never paid and finally, some three years later, defendant was obliged to buy the motel back from Mrs. Alongi. There is no testimony to the contrary. Plaintiff's complaint for an accounting was filed January 23, 1961; some four years and two months after completion of the transaction.
Before commencing analysis of these facts, it should be noted that plaintiff does not seek to rescind the motel transaction from its inception. Plaintiff seeks only to set aside the agreement and the release which she executed in November of 1956 when she divested herself of her interest in the motel. The decree appealed from awarded plaintiff an accounting commencing from November 29, 1956. Therefore, the important aspects of the transaction for purposes of this appeal are those which existed in November of 1956.
 5, 6 The first issue here is whether the relation between these parties was originally or ever fiduciary. For many long years, the courts of Illinois have refrained from fixing inflexible or precise boundaries for the attributes of a fiduciary relationship. (Illinois Rockford Corp. v. Kulp, 41 Ill.2d 215, 222; Seely v. Rowe, 370 Ill. 336, 342; Kosakowski v. Bagdon, 369 Ill. 252, 254.) The relationship which gives rise to fiduciary *250 duties and obligations may be legal or even social. (Kapraun v. Kapraun, 12 Ill.2d 348, 353; Pffaff v. Petrie, 396 Ill. 44, 50; Swenson v. Wintercorn, 92 Ill. App.2d 88, 100.) In any and all cases the existence of a fiduciary duty and relationship sufficient to establish a constructive trust must be shown by evidence which is so clear, convincing and unequivocal as to permit of but one conclusion. (Perry v. Wyeth, 25 Ill.2d 250, 253; Landau v. Landau, 20 Ill.2d 381, 383; Swenson v. Wintercorn, 92 Ill. App.2d 88, 100.) We find no such evidence in the case at bar. Neither the master nor the court found that these parties were in a fiduciary relationship with reference to the motel transaction. The record shows that plaintiff was possessed of a degree of intelligence at least equal to that of defendant. She never reposed trust and confidence in defendant. Defendant never acted in plaintiff's behalf without her express approval and authority.
 7 The fact that defendant had possession of documents and other matters belonging to plaintiff does not in itself make their relationship fiduciary. There is no evidence that defendant ever had more than one signed withdrawal slip for each of plaintiff's accounts. Possession of these slips by defendant is equally compatible with the convenience of plaintiff as it is with placing of confidence; particularly when one considers plaintiff's past conduct in removing funds from a joint account and cash from a safe deposit box the day after her husband's death. Moreover, a central element of the constructive trust is lacking here. There is no evidence of overreaching by defendant. There is no evidence of loss to plaintiff or of profit to defendant. On the contrary, the record shows that plaintiff profited from all of the transactions with perhaps one exception not involved in this appeal.
Furthermore, when defendant returned all of her documents to plaintiff in October of 1956, this marked a change in the attitude of each party to the other. If plaintiff had ever imposed trust or confidence in defendant prior to that date, this vanished completely when the property was returned. Certainly from that point on the parties acted with complete independence. The transaction complained of by plaintiff took place a month after the surrender of all documents by defendant to her. Thus, when plaintiff divested herself of the interest in the motel, the association between the parties did not constitute a fiduciary relationship.
 8, 9 However, it is definite that these parties were partners in the operation of the motel. Despite use of the name of defendant's son in the transaction, the litigants agree that the actual parties in interest were plaintiff and defendant together with Mrs. Alongi. Commencing from this premise, it necessarily follows that a fiduciary relationship existed *251 as a matter of law between these parties as partners in connection with their ownership and operation of the motel. It is established in Illinois that each partner is a fiduciary of the other. (Bandringa v. Bandringa, 20 Ill.2d 167, 174; Rizzo v. Rizzo, 3 Ill.2d 291, 302; Grossberg v. Haffenberg, 367 Ill. 284, 287.) It follows necessarily that plaintiff and defendant each owed the other the duty to exercise the highest degree of honesty and good faith in their dealings and in the handling of partnership assets during the existence of their partnership.
 10-12 As a corollary to this principle, in logical sequence, when a partnership is dissolved the fiduciary relationship is terminated. Dissolution of the partnership may be effected by the express will of any partner at any time. (Bluestein v. Davis, 86 Ill. App.2d 61, 67.) Similarly dissolution may be accomplished at any time by the mutual consent of the partners. (Meyer v. Sharp, 341 Ill. App. 431, 440.) In this regard, dissolution must be carefully differentiated from the winding up of the partnership business and affairs. This distinction is preserved in the applicable statute which provides in substance that dissolution, as distinguished from winding up of the partnership business, may be accomplished by the express will of any partner or all of the partners. Ill. Rev. Stat. 1969, ch. 106 1/2, pars. 29, 30, 31.
In the case at bar, when the parties agreed verbally that the partnership would be dissolved, the dissolution became an accomplished fact. When the parties executed their written agreement on November 21, 1956, which recited their mutual desire of effecting dissolution, this made the dissolution of the partnership a matter of specific contract between them. In fact, the parties went further and each released the other from all claims and demands of every kind in connection with their partnership.
 13 It is apparent that the relationship between these parties, when their agreement for dissolution was consummated, was not fiduciary in nature but they dealt with each other at arms length. Plaintiff entered into the transaction in August, 1955, and withdrew on November 29, 1956. On an investment of slightly under $30,000 for 15 months, she made a profit of $10,500. Plaintiff, therefore, has produced no reason for setting aside the consummated sale of her partnership interest and release of her former partners from all claims.
 14, 15 However, for complete finality of analysis, even if it be assumed that there were fiduciary elements in the factual relationship between these parties, or fiduciary elements in their legal relationship remaining after dissolution of the partnership, it does not necessarily follow that plaintiff may set aside the completed transaction. The presence of a fiduciary element would simply place the burden of proof *252 upon the defendant to show by clear and convincing evidence that the transaction was equitable and just. (Brown v. Commercial National Bank of Peoria, 94 Ill. App.2d 273, 279 aff'd 42 Ill.2d 365, 369; Boryca v. Parry, 24 Ill.2d 320, 327; Melvin State Bank v. Crowe, 97 Ill. App.2d 82, 98.) In cases in which the evidence shows that the principal had independent advice before completing the transaction; that the consideration was fair and adequate and that a full and frank disclosure of all relevant information was made the assailed transaction will be approved. Boryca v. Parry, 24 Ill.2d 320, 327; Masterson v. Wall, 365 Ill. 102, 110, 111; Rendl v. Anderson, 103 Ill. App.2d 255, 264.
To apply this principle to the case at bar, we have already pointed out that plaintiff had completely independent advice from a competent attorney who had practiced law for approximately 35 years. As above shown, the consideration received by plaintiff was fair and adequate.
As regards the issue of factual disclosure by defendant to plaintiff, the master's report shows great uncertainty. The master stated that if the transaction was a loan to Mrs. Alongi, with possible acquisition of her interest in satisfaction of the loan, plaintiff should have been advised of this possibility. This reasoning is manifestly fallacious. The testimony is that defendant did not acquire the motel from Mrs. Alongi until three years later. The master stated another alternative that if defendant was actually acquiring the motel at the time of dissolution in the guise of a purchase by Mrs. Alongi, he should have advised plaintiff of this possibility. The evidence as to this phase of the transaction is that defendant did not actually acquire the interest of Mrs. Alongi but that she retained her interest and gave defendant a note.
 16 The master also mentions failure of defendant to disclose that he furnished the funds to buy plaintiff's interest. This is hardly a matter of crucial materiality. If it had been, the facts could readily have been ascertained by plaintiff's counsel who should certainly have been cognizant of the change in the transaction before closing due to inability of Mrs. Alongi to obtain the needed financing. The conclusion must be drawn that if there was a duty of disclosure it was not violated by defendant in any regard. Upon review and consideration of all the evidence, we are constrained to conclude that defendant entered into the transaction for sale of her interest in the motel "* * * with full knowledge of its nature and effect and because of * * * her deliberate, voluntary and intelligent desire * * *." (Boryca v. Parry, 24 Ill.2d 320, 327.) From virtually every point of view, the conclusion must be reached that the questioned transaction was openly, fairly and deliberately entered into by the parties so that it should be validated and approved by this court.
*253 In our opinion, one of the decisive authorities here is Schmidt v. Landfield, 20 Ill.2d 89. In that case, the Supreme Court dealt with a situation that originated with the highly fiduciary relationship of attorney and client. In addition, the parties were partners. In due course, they separated their interests, made a division of partnership property and executed releases. The clients then sought to set aside the transaction wherein they had released the lawyer. The Supreme Court affirmed judgments of the Appellate Court and the circuit court, dismissing the complaint for insufficiency. This result is based upon the fact that plaintiffs had previously become involved in disagreements with their counsel. They engaged independent counsel who represented them at the time of settlement. In executing the release, they did not rely upon the defendant's advice but upon their own knowledge and the advice of their own counsel. Further, the court held that disputes between the parties should have put plaintiffs on notice not to rely upon any statements made by their former lawyer. Schmidt v. Landfield, 20 Ill.2d 89, 94.
The same reasoning is applicable in the case at bar. In making this settlement, plaintiff did not depend upon defendant to any extent. She relied only upon her own judgment and that of her own independent counsel. After her disputes with defendant and after he returned all of her documents to her, they were not only at arms length; but, figuratively, almost at swords' points. The conclusion cannot be justified that plaintiff "* * * relied upon defendant's advice when the settlement was made." Schmidt v. Landfield, 20 Ill.2d 89, 93.
Insofar as the decree appealed from creates a constructive trust and requires an accounting with reference to the Niles Motel, it will be reversed.
The next issue between the parties arises from the allegations of Count 1 of the third amended complaint. This count alleges a confidential or fiduciary relationship between the parties. Plaintiff alleged that on October 11, 1954, defendant caused $5000 to be withdrawn from her savings account in the Bank and led her to believe that he had purchased stock in the Bank for her with these funds. It is alleged that about October 4, 1955, defendant gave plaintiff a check which he represented as a dividend check from this stock. On October 5, 1956, without plaintiff's knowledge, defendant redeposited this sum of $5000 in her savings account. Plaintiff prayed for delivery of the stock to her in kind. The third count prayed damages of $7000 for failure of defendant to deliver the stock to plaintiff.
The master found that defendant agreed to purchase the stock but that he never did so. He also found that there was no basis for enforcing the purchase agreement between the parties since there is no evidence *254 of the number of shares involved or of the price per share and consequently that there is no basis for allowance of damages. The master did allow plaintiff interest "for use of her money" from October 11, 1954 to October 5, 1956, at the rate of five per cent per annum less a credit of $90 for amounts paid to plaintiff as dividends; being a judgment in favor of plaintiff for $405.92.
It is quite significant that the master failed to find that there was a fiduciary relationship between the parties in this connection. Similarly, in another aspect of the report concerning plaintiff's claim in connection with certain loans, where the master denied recovery, he did not find that the relationship between the parties was fiduciary. The decree similarly failed to find existence of a fiduciary relationship but merely entered judgment in favor of plaintiff in the amount suggested by the master.
The evidence and analysis regarding absence of a fiduciary relationship in the motel transaction are equally applicable here. Moreover, the evidence fails completely to support or justify this aspect of the master's report or the decree. Plaintiff testified that in October of 1954 defendant suggested purchase of additional stock in the Bank by her. On October 11, 1954, $5000 was withdrawn from plaintiff's savings account. This was done by a withdrawal slip entirely in plaintiffs own handwriting. Plaintiff testified that defendant did not give her the shares and that she never thereafter asked defendant for them. Plaintiff also testified that defendant gave her three checks for $30 each representing dividends. Only one of these checks was produced by plaintiff and this is dated October 4, 1955. It is undisputed that dividends on Bank stock were paid in January and July of each year. Plaintiff regularly received dividend checks in these months for all of the remaining 241 shares of stock in the Bank owned by her. On October 5, 1956, $5000 was deposited in plaintiff's savings account. However, the same amount was deposited to her same account on November 20, 1954.
Defendant denied completely that the sum of $5000 was withdrawn by plaintiff for the purpose of buying Bank stock. He denied that he had ever given her dividend checks for this stock. In all cases, plaintiff received regular dividend checks issued by the Bank. Defendant testified that the withdrawal of $5000 on October 11, 1954, was for the purpose of making a loan to one C.A. Hansen. This is substantiated by a cashier's check issued by the Bank for $5000 dated October 11, 1954, payable to Charles A. Hansen and endorsed by him. Defendant testified that this was a short term loan. Plaintiff agreed that the loans made by her were of short duration; from five to perhaps 60 days. Defendant testified that this loan was repaid by Hansen's check dated November 18, 1954 payable *255 to defendant for $5050. On that day, $50, which could have represented interest on the loan for some 37 days, was deposited in plaintiff's checking account; and, on November 20, 1954, the principal amount of $5000 was redeposited in plaintiff's savings account as above noted.
We conclude that there is a complete failure of the proof in this regard. The documentary evidence lends strong credence to defendant's testimony that the transaction was actually a loan to Hansen. Furthermore, plaintiff's own testimony that she never made demand for delivery of the stock also tends to support defendant's theory. The allowance of interest on this money to plaintiff was, in our opinion, unwarranted and the decree should be reversed in this regard.
 17 As above set forth, defendant's counterclaim alleged willful and malicious institution and prosecution of this action by plaintiff to the extreme prejudice of defendant's dealings as a banker. We find no evidence of willful or malicious maintenance of this action by plaintiff. The legal authorities cited by defendant fail to convince us that this record shows willful misconduct by plaintiff. We, therefore, affirm the decree insofar as it dismisses defendant's counterclaim. (The decree directs that the counterclaim be "overruled").
We, therefore, direct that the decree for establishment of a constructive trust and for an accounting with reference to the Niles Motel be reversed; that the judgment in favor of plaintiff in the sum of $405.92 be reversed; that the decree for dismissal of defendant's counterclaim be affirmed and that the cause be remanded to the circuit court with directions to dismiss plaintiff's third amended complaint at plaintiff's costs.
Decree and judgment reversed and cause remanded with directions; dismissal of counterclaim affirmed.
BURKE, P.J., and LYONS, J., concur.