[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE FIRST, SECOND AND THIRD COUNTS OF THE PLAINTIFF'S COMPLAINT
The fourth and fifth counts of the plaintiff's complaint in this action, and the responsive pleadings thereto filed by the named defendant, as well as his counterclaims, assert that they are brothers and co-owners of five parcels of real estate in the towns of South Windsor and Ellington, that they are also equal shareholders as well as sole officers and directors of a corporation, Dzen Farms, Inc., under which they do business, and that they seek a dissolution of the corporation, the dissolution, winding up and liquidation of their partnership, and a partition of the farms which they presently own as tenants in common. The first and second counts of the complaint allege that the purchase by the defendants, John Dzen and his wife, Virginia Dzen, of a parcel of land from Kenneth Miller on April 4, 1996, which had been leased by the corporation for the production and sale of strawberries, while the parties were engaged in mediating the dissolution of the corporation and the winding down of the partnership, constituted the usurpation of a business opportunity and a breach of the defendant's fiduciary obligation to the CT Page 2631 corporation. The third count seeks to impose a constructive trust upon a parcel of land in East Windsor known as "Blueberry Hill" which has been solely owned by the defendant, John Dzen, but which the plaintiff alleges has been "devoted continuously and exclusively for agricultural use for the benefit of the Dzen family farm business. . .".
The plaintiff has filed and briefed a motion in opposition to the defendants' motion to bifurcate the issues of whether the Miller property or the Blueberry Hill property may properly be considered to be constructively owned by either the corporation or the partnership or both, as claimed by the plaintiff in the first three counts of his complaint, and therefore subject to partition in kind. On the other hand, the defendants argue that the court should exercise its discretion under General Statutes § 52-205 and Practice Book § 15-1 to bifurcate these issues and as stated in the first count of the counterclaim, to "partition the Miller and Blueberry Hill properties if [the court] issues declaratory judgments in favor of [the] plaintiff regarding the ownership thereof."
Bifurcation of trial proceedings lies solely in the discretion of the trial court and it may order that one or more issues that are joined may be tried before the others, where it determines that it serves the interests of "convenience, negation of prejudice and judicial efficiency" to do so. ReichholdChemicals, Inc. v. Hartford Accident Indemnity Co.,243 Conn. 401, 423 (1997). The court concludes that the convenience of all concerned, and more importantly, judicial efficiency, will best be served by the resolution of these issues at this time, that the plaintiff has made no showing that he will be prejudiced thereby, and that this is a case where bifurcation is appropriate because it will obviate the unnecessary litigation of these critical questions of law at some later stage of these proceedings. Id.
 I.
The issues raised by the pleadings in the first two counts of the complaint, as amended, are first, whether the acquisition of the Miller property, which had previously been leased by the corporation for the production and sale of strawberries, constituted the usurpation by John Dzen of a business opportunity that rightfully belonged to the partnership or to the corporation, as well as a breach of the fiduciary duty that he CT Page 2632 owed to his partner, Donald Dzen, and second, whether it was a breach of his fiduciary duty to the corporation as an officer and director of Dzen Farms, Inc. for him to have failed to disclose the proposed transaction prior to the purchase in view of the fact that the parties were actively engaged at that time in mediation discussions with an attorney, John Woodcock, in order to facilitate the contemplated dissolution, of the corporation by negotiating the division of the partnership and corporate assets. The underlying facts are substantially undisputed, and based on the admissions made in the defendants' answer and the joint stipulation filed by the parties at the trial, they may be fairly summarized as follows.
John Dzen and Donald Dzen have operated a real estate partnership since January 19, 1968 without any written partnership agreement, and since 1969, John Dzen has served as President, Treasurer and Director of Dzen Farms, Inc., and Donald Dzen as Secretary and Director, although the corporation has not held any meetings, and conventional corporate formalities have not been observed. Since the formation of the corporation and the real estate partnership, the parties have cultivated, maintained and operated a wholesale and retail fruit farm whose primary crops have been raspberries, blueberries and strawberries, and since the 1980s their farming operations have been extended to the growing and raising of Christmas trees for wholesale and retail sale.
John Dzen, as president of the corporation, has determined which crops should be grown on properties utilized by the corporation, and what improvements to make on those properties, and he has also acted as the managing partner of the partnership in that he has initiated and negotiated all of the transactions that involved the purchase and sale of properties owned by the partnership. The following members of the Dzen family are employed by the corporation and are actively involved in its farming and sales operations, namely, Donald's wife, Linda Dzen, and their sons, Joseph and Donald Jr., as well as John's wife Virginia, and their son, John Jr., but none of them have any ownership interest either in the corporate stock or in the partnership real estate as tenants in common.
On November 7, 1995, the plaintiff was formally advised by his brother, John, that he wished to dissolve the partnership and the corporation, and on November 9, 1995, the parties engaged Attorney John Woodcock to act as a mediator in order to CT Page 2633 facilitate the dissolution of the corporation and the real estate partnership. In a letter written on that date to both parties, Woodcock stated that "[t]he parties have agreed to operate the business as usual, with no changes being made in the conduct of their business [and that all] profits will be divided on a 50/50 basis as they have done in the past and [any] issues that arise with respect to the operation of the business shall be submitted to me for my input."
In March, 1996, while Woodcock was still acting as the mediator for the proposed dissolution as agreed by the parties, John Dzen asked him to represent his wife, Virginia, and himself, for the purpose of purchasing the Miller property. The transfer of title took place on April 4, 1996, while the mediation and negotiations through Woodcock were still pending, and before any formal offer or proposal regarding the dissolution had been made by either party to the other.
The Miller property at the time of its acquisition by the defendants consisted of approximately fifteen acres of land, which had been leased continuously for over ten years by the corporation for agricultural purposes, and more particularly, in recent years, for the production and sale of strawberries by Dzen Farms, Inc., and at the time of its purchase, it had valuable plants growing on it which had been harvested by the corporation in prior years, and which were scheduled to be harvested again by the corporation in the summer of 1996. Several months after the purchase of the Miller farm, and before this action was filed, John Dzen refused access to any employee of Dzen Farms, Inc. to enter onto or cross over the property in order to prepare the land for the following year's planting of crops until the end of July, 1996, and prior to that date threatened the plaintiff's son with arrest if he entered the property for the purpose of engaging in such activity.
On July 24, 1996, John Dzen, in his official capacity as president of Dzen Farms, Inc., in a letter to his brother, Donald, stated that because of the "substantial disagreements [that they had about] the present and future direction of [the corporation] which had [led] to a pending lawsuit", he felt that it was in the best interests of the corporation for him to reassign responsibilities, and directed that Donald and his sons would have the full responsibility for the fruit growing portion of the business and that John and his son would assume the responsibility for the tree growing part of the business. In his CT Page 2634 reply to that letter a few days later, Donald stated that the "reassignment" his brother had directed, "especially after you took the Miller property for yourself [was] another effort to position yourself, during negotiations, to the detriment of the corporation, myself and my family."
John's response to Donald's reply letter was that he remained president of the corporation, and that he believed that it was his duty to guide it "through this difficult time and attempt to avoid potential disagreements or confrontations that may arise in day to day operations." He concluded by stating that "[w]hether you recognize my authority or not, I retain the power, as President to continue to make corporate decisions [and the] decision outlined in my July 24, 1996 letter to you will stand."
After an extended hearing on the cross motions of the parties for the appointment of a receiver, the court, in an order dated March 6, 1997, concluded that a judicial dissolution on the ground of corporate deadlock was warranted under § 33-896 of the General Statutes, and also found that in addition to the fact that the parties' jointly owned property is critical to the business of the corporation, the Miller property owned by John and Virginia Dzen and the Blueberry Hill property owned by John Dzen, have "continually been used in the past for the benefit of both the corporation and the [parties]", and that the appointment of a receiver was "necessary in order to wind-down the business of the corporation and resolve on-going disputes and lack of communication between the two equal and only shareholders of the corporation, Donald Dzen and John Dzen." The court also determined that the appointment of a receiver was necessary in order to wind up the corporation without damage to the good will of the business or to the separate and future activities of the two brothers.
In the course of his testimony at the receivership hearing on February 21, 1997, Donald Dzen stated that he had a conversation with Kenneth Miller in November, 1995, about selling the farm leased by the corporation, and because Miller said that his asking price was $200,000, he assumed that Miller was not serious about selling it to the Dzen brothers. However, Donald was not concerned about Miller's apparent refusal to sell at any price at that time, because he believed that Miller's neighbor and relative, Edwin Davis, should have the first chance to buy the property, because Davis would continue to lease it to the corporation for the production of strawberries as Miller had done CT Page 2635 in the past.
John Dzen's testimony at the receivership hearing was that his purpose in acquiring the Miller property was to plant and raise Christmas trees although it had never been farmed for that purpose before, that he expressly asked Woodcock whether "he could handle the deal under the circumstances", and suggested that the attorney's assurance that he could properly represent John and Virginia, his wife, in the transaction, may not have been "good legal advice" on his part. Although John admittedly did not inform Woodcock at the time that Dzen Farms, Inc. was then leasing the property for the production of strawberries, he recalled telling him that "we've been farming that farm for a long time [and that therefore] he should have been aware" of the existence of the lease to the corporation for the cultivation and production of strawberries.
At the trial of the plaintiff's claims of title to the Miller property under the first and second counts of the amended complaint, Woodcock's office notes dated March 26, 1996, which record the information given to him by John Dzen that he relied upon when he agreed to represent the defendants in their purchase of the property, include the notation that there was "no lease" as stated by John in response to the question that Woodcock routinely asks a buyer in order to determine whether or not an adjustment for rental will be required on the closing statement. Another notation made on the same date, indicates that the defendants wanted the bond for deed to be drafted as soon as possible, and the fact that the purchase agreement was executed by the buyers on the following day, and the closing itself took place on April 4, 1996, in accordance with the buyers' instructions to him, was in Woodcock's opinion, "very unusual" under the circumstances.
Woodcock's understanding of the "ground rules" that were to govern the mediation process, as stated in his letter of November 9, 1995, which was sent to both parties confirming their initial discussions in his office, was that the status quo was to be maintained as far as the ongoing family business was concerned, and if there had been any discussion about, or reference to, the acquisition or sale of any corporate or partnership assets related to the operation of the business, Woodcock would have made a note of it in his files and would have advised both of the parties accordingly, because issues of that kind were to be "submitted to me for my input" pursuant to his letter that CT Page 2636 initiated the mediation agreement between both of the parties. Woodcock also testified that when he subsequently learned that the property was in fact leased to the corporation, John Dzen told him that it was an "oversight" on his part, and Woodcock's office notes of that telephone call of May 7, 1996, state that when he told him that he was upset about it, John acknowledged that he should have disclosed the involvement of Dzen Farms, Inc. at the time that he asked Woodcock to represent the defendants in the purchase of the property.
The plaintiff's son, Joseph Dzen, whose primary responsibility was the marketing of the berry crops, was called as a witness at the evidentiary hearing on the plaintiff's claims that his brother had usurped a business opportunity and violated his fiduciary duties as his partner and as president and director of the corporation in buying the Miller farm, and testified that there was ample parking for about two hundred cars for customers who wanted to pick their own strawberries at a reduced price on that property, as well as for those retail customers who wished to do so on the adjacent Davis farm, that was also rented under a verbal understanding with it owners, but which was not directly accessible by car for that purpose. He also stated that because a readily available water supply was essential for the cultivation of strawberries, and a pond on the nearby Abbey farm, which was owned by the partnership was utilized for that purpose, the location of the rented Miller property made it ideally suited for the production and sale of the berries to retail and wholesale customers, both because it gave retail customers easy access to both of the farms, and because of the fact that the irrigation that was necessary for their successful cultivation could be easily obtained from an adjacent source of water, and it was his opinion that these advantages were beneficial to the corporation in that the net income generated by the Miller farm accounted for a substantial percentage of the corporation's berry sales.
Edwin Davis testified that the Dzen brothers, the Davis family and the Millers had been neighbors as well as close friends for fifty years, that he had always been interested in buying the Miller farm and that he assumed that Kenneth Miller would let him know if and when the property was put on the market. Davis acknowledged the fact that he had assured Donald Dzen on several occasions that if Miller sold it to Davis, he would give a long term lease to Dzen Farms, Inc. so that the brothers could continue to farm it, and he acknowledged that his assurances that he would do so in the event of a sale to him led CT Page 2637 the plaintiff to believe that the corporation's current use of the property would not be affected by a transfer of title from Miller to Davis.
At the time of the sale of the Miller property to John and Virginia Dzen on April 4, 1996, for $82,500, Kenneth Miller did not know that the corporation was about to be dissolved or that there were ongoing disputes between the brothers about the operation of the family business, and he assumed that John Dzen was acting for his brother and that the farm would continue to be used for the raising of strawberries as it had been under the oral lease. Although Miller did not tell the plaintiff or his sons about the transaction, he testified that he saw no need for him to do so, and that in any event, there was no intention on his part to conceal the fact that the property was sold nor was there any agreement between the seller and buyers to keep it secret from any third parties who might be affected by the transfer of title to the property.
Donald Dzen testified that although he heard about the sale from Miller to his brother at or about the date of the closing, he had not been informed of his brother's intentions before that date, and he stated that had he been told about it in advance, he would have definitely agreed to the price, terms and conditions of the sale that Miller had proposed. Although the brothers had not communicated with each other since February, 1995, because of a personal dispute not related to the family's business relationship, he had always trusted and relied upon John's business judgment in acquiring properties that would promote the best interests of the family business.
During the year of 1995, despite the growing hostility between the parties and the lack of communication between them, as far as the plaintiff was concerned, John continued to direct the normal activities of the business as he had done in the past, and Donald had no reason to believe that John had decided to terminate their business relationship until he received Woodcock's letter to that effect in November of that year. In the plaintiff's own words, up until that time, at least, he considered the family's business to be "alive and well" because John continued to have overall direction of its business activities as before, and they continued to divide their profits after they had paid their expenses, as they had always done in the past, and in his mind, at least, after he agreed to the mediation of the dissolution of their relationship, the term CT Page 2638 "business as usual", as used in Woodcock's letter of November 7, 1995, included the continued cultivation, production and sale of strawberries.
John Dzen's testimony concerning the circumstances leading up to the purchase of the Miller Farm was that Miller approached him about selling the property and that he saw no reason to tell his brother about the offer to sell it, because Dzen Brothers, Inc., as he put it, was "dead", and that he had as much right as his brother, Donald, and his sons, Joseph and Donald Jr., to seek what he referred to as "other opportunities", as his nephews later did in December, 1996, when they obtained an option on a property in Ellington which they subsequently operated as a retail stand to sell berries and trees as well as other products. He also denied that a statement that he made to Joseph Dzen at the end of March, 1996, to the effect that his nephew would be "in for a big surprise", was meant to refer to his intended purchase of the Miller farm, and he had no recollection of another statement he made in the Spring of 1996 to his nephew, Donald Jr., at or about the time of that transaction that he would "bring the farm to its knees [and that] he had made the farm and he could break it."
It should also be noted that John Dzen's testimony appears to support his special defense that in all of his actions as President of the corporation and managing partner up to the time of the court-ordered appointment of a receiver in March, 1997, he was exercising what he believed to be sound business judgment in both of those capacities. More specifically, he states that his action in refusing "to continue the production, maintenance or the preparation of certain crops [is] consistent with the business judgment rule, as articulated and defined by Connecticut law."
The documentary and testimonial evidence presented through the office notes and testimony given by Woodcock concerning the circumstances of the apparent conflict between his roles as mediator and attorney for the defendants in the acquisition of the leased Miller property tend to refute the testimony of the defendants that he was "negligent" in agreeing to represent them as well as the documentary evidence that they introduced in evidence by way of a letter that he wrote in 1991 on behalf of the corporation opposing a proposed radioactive waste facility in which he referred to "long-term agricultural leases" on properties used by the corporation, including the Miller farm. CT Page 2639 The notes contained in Woodcock's mediation file, for example, on March 26, 1996, the same day he was retained by the defendants, which state that John would prepare his own proposal for the division of the farms within thirty days, together with the entries made on May 7, 1996, as the result of a call to him by the plaintiff's attorney informing Woodcock of the rental by the corporation of the Miller farm, reflecting as they do, genuine shock and surprise on his part after he was informed of the actual circumstances, serve to confirm the credibility of Woodcock's testimony concerning the actual circumstances that led him to believe that there was no apparent conflict between his role as mediator and his representation of the defendants, and lead to the inescapable conclusion by the court as the trier of fact that the acquisition of the property was motivated primarily by John Dzen's desire to gain a tactical advantage in the mediation process, despite the agreed-upon "ground rules" for the mediation that were required in order for that process to be successfully pursued by the parties.
The fiduciary duty of partners is governed in part by the requirement of the Uniform Partnership Act that every partner account for any benefit derived by him without the consent of the other partners from any transaction "connected with the formation, conduct or liquidation of the partnership or from any use by him of its property." General Statutes § 34-59 (Emphasis added.) This provision means that the duty of good faith existing between the partners continues so long as the enterprise is in existence, and until the relationship is terminated or partnership affairs are fully settled. 59A Am.Jur.2d, Partnership § 429 (1987).
The consent of the other partner or partners is a prerequisite to a partner's right to individually retain the benefit of any transaction connected with the "liquidation of the partnership" under General Statutes § 34-59(1) of the Connecticut Uniform Partnership Act (UPA), and it must necessarily be an informed consent, with knowledge of the facts necessary to give an intelligent consent through full disclosure consistent with the other partner's fiduciary duties. 59A Am.Jur., supra, § 445. Our Supreme Court has stated that "[t]his statutory language was intended to incorporate the fiduciary relationship as described by Chief Judge Benjamin Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545
(1928) [in which he stated that a fiduciary] is held to something stricter than the morals of the marketplace." Konover DevelopmentCT Page 2640Corp. v. Zeller, 228 Conn. 206, 218, n. 9.
The fiduciary obligation of partners to act with the utmost candor and good faith in their dealings between themselves is not lessened by the existence of strained relations between them or the existence of any condition which justifies the firm's dissolution. Id., § 430. The fiduciary nature of the partnership relation means that a partner has a duty to share with his partner those business opportunities that are clearly related to the operations of the business, and this principle prevents a partner from acquiring for his individual benefit, property in which the firm is specifically interested or in acquiring firm leases for his own benefit. Id., § 443.
The fiduciary duties between partners is a continuing one and it survives a partner's withdrawal or formal disassociation where the withdrawing party remains tied to his former partner and they continue the sharing of profits and losses. Id., § 431. These duties continue during the winding up of the partnership and apply as well to the preservation of its assets, and are especially applicable when one of the parties is still in charge of a continuing partnership business. Id.
The principal argument made by the defendants in this case is that the notice given by John Dzen on November 7, 1995, that he wished to dissolve the partnership, followed by Woodcock's letter of November 9, 1995, in which he stated that at the "mutual request" of the parties he had agreed to facilitate its dissolution by way of mediation, constituted the termination of their relationship as a matter of law, and thereby released the defendant, John Dzen, from any fiduciary duties that he would have otherwise owed his brother and the partnership by virtue of that relationship. Their reliance, however, on cases that hold that the fiduciary relationship of partners terminates on notice of an intent to dissolve the partnership, such as Silverberg v.Schwartz, 438 N.Y.S.2d 143 (App.Div. 1981), and that where a partnership is dissolved the fiduciary relationship terminates where the dissolution agreement is consummated and the parties thereafter deal with each other at arms length, such as Babray v.Carlino, 276 N.E.2d 435 (Ill.App. 1971), is misplaced in the light of the express provisions of the UPA concerning the dissolution and the termination of a partnership at will, such as the one that existed in this case.
Section 34-67 of the Connecticut UPA defines the term CT Page 2641 "dissolution" of a partnership as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." The Official Comment to that section of the Uniform Act notes that "although the word is used to designate only the termination of ordinary business relations [it] is also frequently said that [it] terminates the partnership [and in order to remove] this confusion [in] this act dissolution designates the point in time when the partners cease to carry onthe business together; termination is the point in time when all the partnership affairs are wound up; winding up, the process of settling partnership affairs after dissolution." (Emphasis added.) 6 U.L.A. 752 § 29 p. 752 (1995).
The undisputed facts in this case as reflected in Woodcock's letter of November 9, 1995, are that both the partnership and the corporate business of raising berries and Christmas trees were to be operated "as usual, with no changes being made in the conduct of [its] business [and that the] profits will be divided on a 50/50 basis as [the parties had] done in the past." Woodcock also expressly agreed in the same letter to "facilitate" the dissolution of the partnership and stated that the parties hoped that his efforts to mediate the dissolution, winding up, and eventual termination of the partnership would be concluded by September 1, 1996.
Section 34-69(1) of the Connecticut UPA enumerates the ways in which a partnership may be dissolved by one of the partners without violating the agreement between them and expressly provides that a dissolution may be caused by the unilateral exercise of the "express will of any partner when no definite term or particular undertaking is specified [in any such agreement]." This particular provision would appear to support the defendants' argument that John Dzen's decision to end the business relationship with his brother effectively triggered the dissolution of the partnership and set in motion its winding up and eventual termination.
Nevertheless, even if it could be assumed under the facts of this case that the exercise of this statutory right by one partner could be accomplished despite the fact that the partners continued to carry on their business activities throughout the unsuccessful mediation process until the court's appointment of a receiver sixteen months later and thereafter up to the present time, this form of "dissolution" did not terminate the CT Page 2642 defendant's fiduciary relationship to the partnership because upon "dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." General Statutes § 34-68. "There may be a relaxation of a partner's duties to his co-partners in relationships that look to the future of the newly dissolved partnership [but] in dealings effecting the winding up of the partnership and the proper preservation of partnership assets during that time, `the good faith and full disclosure exacted of partners continues.'" Lavin v. Ehrlich, 363 N.Y.S.2d 50, 52 (App.Div. 197 4).
Where the managing partner serves notice on his business partners of his immediate withdrawal from the partnership and of its dissolution, and thereafter institutes and carries out negotiations for the purchase of property in which the business has a leasehold interest "without offering the ultimate deal to his partners (he thereby breaches] his fiduciary duty in not making that offer and in appropriating this important partnership asset to himself [because the] opportunity to purchase the property and insure continued possession of the goodwill asset embodied in the location should have been offered to the partnership. " Lavin v. Ehrlich, supra, 53. The holding by the trial court in Lavin that during negotiations involving the dissolution of a partnership each partner must deal fairly with his copartners and must not conceal from them important matters within his own knowledge concerning the business of the partnership has been followed in almost all of the cases, including those in which the fact that the personal relations between the partners had deteriorated to the extent that neither party has any confidence in the other does not relieve them of their fiduciary obligations to each other. Bovy v. Graham, Cohen Wampold, 564 P.2d 1175, 1178 (Wash.App. 1977); Hurwitz v.Padden, 581 N.W.2d 359, 361 (Minn.App. 1998).
The acquisition by a member of a partnership leasing property of the reversion of the lease by himself in his own interest without holding it for the partnership gives rise to a constructive trust unless there has been full disclosure to the other partners and acquiescence on their part. Bakalis v.Bressler, 115 N.E.2d 323 (Ill. 1953). "The fiduciary relationship embraces all matters reasonably related to the partnership business [and the defendants] cannot divorce the real estate from the partnership business and thus remove it from the protection of the fiduciary relationship. " Id. 327. CT Page 2643
When a partner has engaged in self-dealing, that partner has the burden of proving the fairness of his actions and that those actions did not result in harm to the partnership. Starr v.Fordham, 648 N.E.2d 1261, 1265 (Mass. 1995). This court, as the trier of fact, has already found that the Miller farm was acquired by the defendant partner in order to gain a tactical advantage in the mediation process, a form of self-dealing which does not permit him to invoke the business judgment rule as a defense. See id. at 1266.
The rule that partners as well as officers and directors of corporations are not permitted to use their fiduciary relationship with the partnership or the corporation to benefit their own personal interests extends to all transactions where one's personal interests conflict "with his acts in the fiduciary capacity, and it works independently of the question whether there was fraud or whether there was good intention." Mallory v.Mallory Wheeler Co., 61 Conn. 131, 138 (1891).
The business judgment rule, which is the basis of the special defense against the plaintiff's claim that his brother had usurped a business opportunity of Dzen Brothers, Inc. and thereby violated his fiduciary duty as president and director of the corporation, is inapplicable, because a fiduciary may not acquire, in opposition to the corporation, "property in which the corporation has an interest or tangible expectancy or which is essential to is existence." (Internal quotation marks omitted.)Murphy v. Wakelee, 247 Conn. 396, 403-04 (1998).
In this connection, judicial notice is taken of this court's order appointing the receiver which states that "[o]ther property in the name of the defendants John Dzen and Virginia Dzen (the Miller Property) . . . . has continually been used in the past for both the corporation and the plaintiff Donald Dzen and the defendant John Dzen [and that the] appointment of a receiver is further necessary in order to wind up the business of the corporation without damage to the good will of the business or to the separate and future business activities of [the] two principals . . . ". It is also of some significance that after almost thirty years of corporate inactivity, the defendant, John Dzen, in July of 1996, chose, for the first time in the corporation's existence, to exercise his authority as president to "reassign" the responsibilities of the principals and their families, and in his words, to "retain the power, as President to CT Page 2644 continue to make corporate decisions [whether] you recognize my authority or not . . .".
"If a corporate officer is presented with a business opportunity that the corporation is financially able to undertake, is in line with its business and is one in which the corporation has an interest or expectancy, the self-interest of the officer will be brought into conflict with the interest of the corporation and the law will not permit him to seize the opportunity for himself." Murphy v. Wakelee, supra, 404. Where a plaintiff establishes the fiduciary relationship and the corporate opportunity, the burden then shifts to the officer to establish, by clear and convincing evidence, the fairness of his dealings with the corporation. Ostrowski v. Avery, 243 Conn. 355,362 (1997).
An officer and director of a corporation may not purchase for himself property under lease to his corporation or purchase property which the corporation needs or wants to acquire or is thinking of acquiring, or take advantage of an offer made to the corporation, or of knowledge which came to him in his capacity as an officer and director. Burg v. Horn, 380 F.2d 897, 899-900 (2d Cir. 1967). Any such purchase by a corporation's managing officer constitutes a "palpable breach of duty to the corporation, and to prevent [such a result] the purchase may be held to inure to the [plaintiff's] benefit upon [his] equitably reimbursing the [defendants] on account of what they have expended in the purchase." Lagarde v. Anniston Lime Stone Co., 28 So. 199, 201
(Ala. 1900).
For the foregoing reasons, with respect to the issues raised in the first count of the plaintiff's complaint, the purchase of the Miller farm on April 4, 1996, while the parties were still engaged in mediating the winding down of the partnership, constituted the usurpation of a partnership opportunity by the defendant, John Dzen, as well as a breach of the fiduciary duty that he owed to the plaintiff as his partner in the course of the liquidation of the partnership that was the subject of Woodcock's ongoing mediation efforts at that time. The court also finds the issues for the plaintiff on the second count of the complaint in that the transaction constituted a breach of the fiduciary duty owed by John Dzen to Dzen Farms, Inc. as its president and one of its directors.
Accordingly, judgment may enter in favor of the plaintiff CT Page 2645 against the defendants on the first and second counts of the complaint and it is ordered that a constructive trust be imposed upon the real property referred to herein as the Miller farm for the benefit of either the partnership or the corporation or both and that the plaintiff reimburse the defendants for one half of the purchase price of $82,500.
 II.
The third count of the complaint in which the plaintiff seeks to have the court impose a constructive trust on the Blueberry Hill property, the record title to which is held solely by John Dzen rather than in the names of the brothers as tenants in common, alleges that the intent of the parties has been to treat that "property as a partnership asset, and to consider it as [such]." The plaintiff also asserts, and the defendant admits, that John Dzen "has claimed and continues to claim exclusive ownership of the [property] despite the extensive expenditures and investments by the corporation since January, 1968, and despite the intention of the [parties] in making [those] investments and expenditures."
The defendant, John Dzen, has admitted in his answer that since January, 1968, when Dzen Farms, Inc. was formally incorporated, it has made substantial investments of capital and labor in developing the property for agricultural production, including, among other things, irrigation pipe laying, driveway and parking lot construction as well as pond construction and the corporation has also since that date continuously paid all property taxes and insurance payments, and that since that date the defendant "has made no unreimbursed expenditure or investment of his own funds in the property." It is also undisputed that the funds used to pay the note balance and obtain a release of the mortgage on the property in the original amount of $20,000 were derived from a loan in the amount of $68,000 from the Federal Land Bank in July, 1966, which debt was paid off from partnership funds.
John Dzen acquired title to the property, which was then known as the McDonald farm, by a warranty deed dated May 25, 1963, and his father, Steven Dzen, co-signed the note for the purchase of the property. The attorney who represented the Dzen family business, which was known at that time as S. Dzen Sons, confirmed the 1966 payoff of the Federal Land Bank loan and stated that the father was looking to the future and wanted both CT Page 2646 of the sons to carry on the family's farming business.
The accountant who handled the corporate and partnership business accounts from 1991 to 1995 testified that during that time he was never told that Blueberry Hill was owned by John Dzen, and the partnership income was paid by the corporation in the form of rental in one lump sum and that it was his understanding that it included all of the properties which were being farmed. Although the rental of the land from 1991 to 1993 generated income to the partnership of about $20,000 a year, John never asked for a separate check for Blueberry Hill or voiced any objection to him that it was unfair or claimed that he was accepting the payment of taxes and insurance on the property in lieu of rent.
John Dzen testified that when the property was acquired in 1963 he was, as he put it, "in partnership" with his father and he could draw on the farm account even though it was in his father's name. He also stated that the interest payments on the purchase prices of farm properties that were subsequently purchased in which title was taken in the names of both brothers prior to the incorporation of the family business and the inception of their real estate partnership in 1968, "probably came from the farm checking account" because he had no checking account in his own name at the time those purchases were made.
The parties have stipulated that the value of the Blueberry Hill property is $185,000 as stated in an appraisal dated April 18, 1996, which was made in the course of the mediation. The appraiser's report noted that the cost of the improvements made on the property by the corporation was $111,641.00 at the time they were made and $145,562.00 in current dollars.
Whether land owned by one partner prior to the formation of the partnership remains individual property thereafter or becomes a partnership asset is primarily a question of the intention of the partners which may be ascertained by evidence of their acts and conduct. 59A Am.Jur.2d, Partnership § 377. "The fact that such realty is used for partnership purposes is not of itself, standing alone, sufficient to establish an intent to contribute it to the partnership assets." Cyrus v. Cyrus, 64 N.W.2d 538, 543
(Minn. 1954).
Although the use of the land in the business, while of some significance, is far from conclusive, the fact that the CT Page 2647 partnership subsequently improved the property, that it was carried as a partnership asset on the firm's records, that taxes and other expenses such as insurance, were paid with partnership funds, or that the income or proceeds of the property have been treated as partnership funds, are factors that support the conclusion that the parties intended the land involved to be a partnership asset. Annot., 45 A.L.R.2d 1002, 1011 (1956). Where a farm is purchased with partnership funds and "subsequent disbursements for improvements and expenses appear in a `Farm Account' in the partnership books, and in most cases the taxes were paid by the partnership and were claimed as deductions in the partnership income tax returns [these] indicia are enough to evince an intention to acquire and hold the farm as partnership property." Steinmetz v. Steinmetz, 125 Conn. 663 at 666 (1939).
The fact that a business partnership exists between the parties will not prevent them from being regarded as tenants in common depending upon their understanding and intention. Id. "[C]ircumstances such as purchase with partnership funds, and the course of their conduct and dealings, such as the carrying of income or expenses in the partnership accounts, are significant and may be determinative of status as a partnership asset." Id., 666-67.
The Steinmetz decision, it should be noted, predated the UPA which was adopted in this state in 1961, and prior to its enactment a partnership could not take title to real estate, and any land needed for partnership use had to be taken in the names of the individual partners or in the name of one of them. SeeShanahan v. Olmsted County Bank Trust Co., 14 N.W.2d 433, 435
(Minn. 1944). At the time of the conveyance of title to John Dzen in 1963, however, the UPA provisions applicable to that transfer were that "[a]ll property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property [and unless] the contrary intention appears, property acquired with partnership funds is partnership property." General Statutes (Rev. to 1995) § 34-46(1) and (2).
Where two brothers as partners farmed a number of farm properties for fifty years, the record titles to which were in both of their names except for the "home farm" which had been acquired earlier in the name of the younger brother who died in 1940, the Minnesota Supreme Court held that title to the property constituted part of the assets of the partnership. Shanahan v.CT Page 2648Olmsted County Bank Trust Co., supra, 435. The court stated that "[t]here is no doubt that the money in the checking account came from the sale of the products of the farms [and that the] initial payment was small, for a purchase money mortgage was given for the greater part of the price." Id.
Under the facts of this case, as in Shanahan, this court finds no evidence whatsoever that it was the intention of either partner from 1963 until some time in 1995 to treat Blueberry Hill differently than the other properties that were being farmed by them and their respective families during that time. Moreover, a reasonable inference can be drawn by the court as the trier of fact in this case that the defendant, John Dzen's, belated claim of title to that property was motivated by his desire to gain a tactical advantage in the mediation process as indicated in a letter from Woodcock dated May 21, 1996, which states that "John is unwilling to do anything with the Miller Farm and the Blueberry Hill Farm with respect to change in ownership [because] the corporation has not paid any rent for thirty years [and also asserts that] Blueberry Hill is not for sale [but if] you are interested in raising blueberries, he will be willing to discuss a lease. . .".
The court also takes judicial notice, as it did in Part I of this opinion with respect to the Miller property, that this court's order appointing the receiver on March 6, 1997, concluded that the Blueberry Hill farm had been continually used in the past for the benefit of both the corporation and the partnership. Accordingly, the common use of the property by the partnership despite the fact that title to the property lies in one of the partner's names only, is sufficient "to constitute a trust by the [holder] of legal title for the benefit of the partnership, where the circumstances make clear the parties' implicit understanding that common use of the property was at the heart of their common enterprise." 59 A Am.Jur.2d 419-20, Partnership § 352 (1987).
For the foregoing reasons, judgment may enter in favor of the plaintiff against the defendant, John Dzen, on the third count of the complaint and it is ordered that a constructive trust be imposed upon the real property referred to herein as the Blueberry Hill farm in the town of East Windsor for the benefit of either the partnership or the corporation or both.
Hammer, JTR CT Page 2649